UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-10541-RWZ

| | |
|---|---|
| JOEL JEANNITE,<br><br>    Plaintiff<br>v.<br><br>CITY OF HAVERHILL, STEPHEN BRIGHI, in His Capacity as CHIEF OF THE HAVERHILL POLICE DEPARTMENT, STEPHEN DOHERTY, GEORGE DEKEON, JR., JOHN DOE, and JOHN ROE,<br><br>    Defendants | DEFENDANTS' L.R. 56.1 STATEMENT OF MATERIAL FACTS OF RECORD AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED |

1. On July 30, 2001, City of Haverhill Police Officers Stephen Doherty ("Doherty") and Glen Fogarty ("Fogarty") were on patrol in a police cruiser in the City. Excerpts of Deposition of Stephen Doherty ("Exhibit A"), p.65, l.7-10; Excerpts of Deposition of Glen Fogarty ("Exhibit B"), p.25, l.10-13. Officer George Dekeon ("Dekeon") was patrolling in a separate cruiser by himself. Excerpts of Deposition of George Dekeon ("Exhibit C"), p.43, l.6-16.

2. At approximately 8 p.m., the police dispatcher sent a transmission, advising of a 911 call from a resident of 11 Union Street who reported suspicious activity. Specifically, the Union Street resident had reported that a black male in a black Jaguar whom she did not know came to her house and asked her questions. Exhibit A, p.65, l.15-19; Exhibit B, p.26, l.13-16; Exhibit C, p.46, l.3-6; p.58, l.4-5. The dispatcher making the transmission used the term "suspicious activity." Exhibit A, p.117, l.19-23.

3. The transmission also reported that, the previous day, a Union Street resident had called the police station, reporting the identical activity. Exhibit A, p.65, l.18-19; Exhibit B, p.27, l.12-16; Exhibit C, p. 46, l.7-11.

4. Union Street is located in an area known as "Acre Neighborhood." Acre Neighborhood was known to Officers Dekeon, Doherty, and Fogarty as an "explosive" area, with the City's highest rate of crime. There is considerable drug activity in the area, as well as numerous incidents of violence, including shootings. In 1996, a state trooper was stabbed there; and in the two years prior to the incident underlying this Complaint, two major disturbances had broken out during arrests. Exhibit A, p.44, l. 9-20; p.91, l.8-9; p.118, l.23-p.119, l.11; p.125, l.15-24; Exhibit B, p.24, l.2-10; Exhibit C, p.50, l.20-p.51, l.3.

5. Dekeon was advised by the dispatcher to respond to the 911 call from Union Street. Exhibit C, p.45, l.21-23. Doherty and Fogarty responded to the dispatch as well, because they were in the immediate area. Exhibit A, p.68, l.2-6; Exhibit B, p.31, l.19-22.

6. Doherty and Fogarty were the first to arrive at the scene of the 911 call. Exhibit A, p.71, l.16-17.

7. When Doherty and Fogarty arrived, they observed a black Jaguar, with its trunk lock missing. Exhibit A, p.71, l.5-7; l.10-11; p.72, l.20-22; Exhibit B, p.32, l.5-8.

8. Based on the officers' experience, the missing trunk lock was an indication that the vehicle was stolen. Exhibit A, p.81, l.3-8; Exhibit C, p.61, l.10-11.

9. Doherty and Fogarty ordered the driver of the Jaguar, plaintiff Joel Jeannite, to stop and put his hands out of the car; Jeannite complied with the order. Exhibit A, p.75, l.2-6; Exhibit B, p.33, l.1-3.

10. Doherty approached the car and twice asked Jeannite to produce a driver's license and motor vehicle registration. Exhibit A, p.80, l.10-15; Exhibit B, p.35, l.8-11; Excerpts of Deposition of Joel Jeannite ("Exhibit D"), p.68, l.13-18.

2

11. Jeannite failed to produce a driver's license or motor vehicle registration. <u>Exhibit A</u>, p.84, l.6-8; <u>Exhibit B</u>, p.35, l.11-13; <u>Exhibit D</u>, p.69, l.2-3.

12. Dekeon arrived on the scene while Doherty was attempting to obtain Jeannite's license and registration. <u>Exhibit A</u>, p.84, l.15-16; <u>Exhibit B</u>, p.37, l.10-12.

13. Upon arrival, Dekeon observed the Jaguar with its trunk lock missing, and heard Doherty request Jeannite's license and registration. <u>Exhibit C</u>, p.59, l.1-3; p.61, l.4-6.

14. Dekeon then asked Jeannite to produce a license and registration, which Jeannite did not do. <u>Exhibit C</u>, p.70, l.5-7.

15. Dekeon placed Jeannite under arrest for failure to produce a license and registration, pursuant to G.L. c.90, §25, and disorderly conduct, pursuant to G.L. c.272, §53. <u>Exhibit C</u>, p.70, l.9-14.[1]

16. Dekeon alone effected the arrest of Jeannite, applying handcuffs to him and placing him in a police cruiser. <u>Exhibit A</u>, p.120, l.23-p.121, l.15; <u>Exhibit B</u>, p.60, l.5-8; <u>Exhibit C</u>, p.70, l.9-14; p.71, l.1-3.

17. Other than Dekeon's placement of handcuffs, no officer engaged in any physical contact with Jeannite. <u>Exhibit D</u>, p.107, l.17-20. Jeannite sustained no physical injury as a result of his arrest. <u>Id.</u>, p.42, l.20-23.

18. No officer threatened Jeannite in any way during the arrest. <u>Exhibit D</u>, p.107, l.14-16.

19. Jeannite, who is African-American, testified that no police officer said anything directly to him that he perceived as racist or derogatory based on his race. <u>Exhibit D</u>, p.86, l.4-7

---

[1] Most of the facts surrounding Jeannite's arrest for disorderly conduct are disputed. This Statement sets forth only the undisputed facts which, defendants submit, require entry of judgment in their favor as a matter of law, for the reasons set forth in the accompanying Memoranda.

20. Following the arrest, Dekeon performed an inventory search of Jeannite's vehicle. Exhibit C, p.81, l.4-6.

21. The policies and procedures of the Haverhill Police Department provide that whenever a vehicle is to be towed or impounded, "an inventory of that vehicle must be performed by either the investigating officer or his superior officer."  The policies and procedures also prescribe the methods for conducting such an inventory, which include "[a]n examination of … the interior of the trunk." City of Haverhill Motor Vehicle Inventory Policy ("Exhibit E").

22. Following Jeannite's arrest, Dekeon applied for a criminal complaint against him on charges of failure to produce a license and registration, and disorderly conduct. Docket for Criminal Case No. 0138CR001518 ("Exhibit F").

23. Jeannite was subsequently convicted by a criminal jury of the charge of failure to produce a license and registration.  Exhibit F.

24. Shortly after the arrest and filing of criminal charges against Jeannite, Chief Brighi met with Jeannite and his criminal attorney, Marsha Kazarosian ("Kazarosian"), at Kazarosian's request.  Excerpts from Deposition of Stephen Brighi ("Exhibit G"), p.43, l.12-17.

25. To prepare for the meeting, Brighi reviewed the police reports generated by Jeannite's arrest, and concluded that probable cause existed for the arrest and filing of criminal charges against him.  Exhibit G, p.40, l.4-10, l.21-23.

26. The department's head of Internal Affairs, Sgt. John Arahovites, also attended the meeting, at Brighi's request. Exhibit G, p.44, l.10-11.

27. At the meeting, Kazarosian repeatedly expressed concern that Jeannite's arrest would negatively affect his status as a student at Norwich University, and possibly result in

4

his expulsion, giving Brighi the "impression … that Miss Kazarosian and Mr. Jeannite were looking for a way out of the charge." Exhibit G, p.44, l.15-19; p.45, l.9-11; see also Excerpts from Deposition of John Arahovites ("Exhibit H"), p.52, l.23-p.53, l.1.

28. Based on compassion for Jeannite's situation and the relatively minor nature of the charges against him, Brighi offered to "make a call to the District Attorney's office," to try to get Jeannite enlisted in a "diversion" program. Exhibit G, p.45, l.20-p.46, l.7); Exhibit H, p.65, l.10-14; p.66, l.1-3.

29. "Diversion" is a program run by the District Attorney's office which offers young people charged with minor violations a chance to perform community service in exchange for having the criminal charges removed from their record. Exhibit H, p.53, l.20-24; p.54, l.3-13.

30. Brighi "certainly didn't hear anything … by Attorney Kazarosian or Mr. Jeannite that day that would lead me to believe there were any civil rights violations" by his officers. Exhibit G, p.52, l.7-13. However, Kazarosian's reputation as a high-profile civil rights lawyer, rather than a criminal attorney, suggested to Brighi the potential for a subsequent civil suit. Exhibit G, p.51, l.5-12; see also Borne, et al. v. Haverhill Golf & Country Club, Suffolk Superior Court, C.A. No. 96-6511-C (Jan. 24, 2000)). This concerned him, since his review of the police reports established no wrongdoing, and, since, in his experience "not every civil rights lawsuit … deserves to be brought." Exhibit G, p.50, l.24-p.51, l.4; p.51, l.22-p.52, l.1.

31. Thus, Brighi requested assurance from Kazarosian that she would not "bring some type of a lawsuit against the City after I grant your wish and try to get this case dismissed." Exhibit G, p.46, l.14-19.

32. Kazarosian declined to give such assurance. <u>Exhibit G</u>, p.46, l.19-20.

33. Brighi and Arahovites also offered Jeannite the opportunity to file a written complaint, and even offered to bring Jeannite a complaint form. <u>Exhibit H</u>, p.61, l.1; p.68, l.19-21; p.69, l.6-10. Jeannite, however, declined to file a written complaint. <u>Exhibit H</u>, p.61, l.1-2; p.69, l.11-12.

34. Pursuant to the policies and procedures of the Haverhill Police Department, the filing of a written complaint of officer misconduct triggers an investigation which includes interviews with all witnesses to the subject incident; requests for written reports from the subject officer(s) <u>and</u> any other member of the police department connected to the subject matter of the complaint; review of the complaint and subsequent investigation by the Chief of Police; and, if necessary, creation of a panel to conduct further investigation. <u>City of Haverhill Police Department General Order No. 3</u> ("Exhibit I"), §1(2)-(5).

35. Filing of a written complaint is not necessary to trigger an investigation; where a complainant wishes to make a verbal complaint only, the Officer in Charge at the time must submit a report to the Chief of Police "indicating the action taken on the complaint." <u>Exhibit I</u>, §1(b)(1)(b)(1). The department's policy further provides that, where warranted, a range of disciplinary measures may be imposed, including but not limited to letters of reprimand, punishment duty, suspension, and discharge (with the Mayor's consent). <u>Police Manual for the City of Haverhill</u>, Section 1-J ("Exhibit J").

36. Following the meeting, Brighi directed Arahovites to order all three officers involved in the arrest to submit reports on the incident for his review. <u>Exhibit H</u>, p.64, l.2-3; <u>Memoranda to Officers Doherty, Dekeon and Fogarty from Sgt. Arahovites</u>, and

6

      Responding Memoranda ("Exhibit K"). Based on his review of these reports, Brighi saw "absolutely" nothing wrong with the arrest. Exhibit G, p.51, l.22-p.52, l.7.

37. Brighi had no further involvement in Jeannite's prosecution, and neither he nor any Haverhill police officer had any communication with the prosecuting authorities about the disposition of the charges against Jeannite. Exhibit G, p.47, l.6-18; Excerpts from Deposition of Murat Erkan ("Exhibit L"), p.21, l.4-5, l.14-16; p.26, l.13-20; p.50, l.22-p.51, l.1; p.57, l.10-14.

38. All Haverhill police officers, including the defendants, have completed training in an academy operated by the Municipal Police Training Committee (formerly called the Massachusetts Criminal Justice Training Council), which includes instruction in constitutional issues such as arrest, search and seizure and motor vehicle stops. Exhibit A, p.16, l.11-23; Exhibit B, p.11, 12-20; p.12, l.7-p.13, l.1; Exhibit C, p.10, l.13-15; p.11, l.14-18; Exhibit G, p.10, l.18-20; Answers to Plaintiff's First Set of Interrogatories to City of Haverhill, No. 4 ("Exhibit M").

39. After completing the academy, officers receive an in-house orientation, which includes ride-alongs with senior officers. Exhibit A, p.17, l.7-16; Exhibit C, p.15, l.13-15.

40. All officers also take between 32 and 40 hours of annual "In-Service" training, which includes instruction on developments in constitutional law. Exhibit C, p.12, l.2-8; Exhibit G, p.18, l.19-24; Exhibit M.

41. Further, every officer is provided a copy of the Haverhill Police Department's Policies and Procedures manual, which contains information on constitutional law issues such as search and seizure, arrest, detainment, and the use of force. All officers must provide written acknowledgement of receipt of the Policies and

      Procedures manual. Exhibit A, p.55, l.15-19; Exhibit B, p.45, l.19-p.46, l.2; Exhibit C, p.34, l.23-p.35, l.6; Exhibit M.

42. In addition, Haverhill police officers attend seminars and courses outside the Department, which are coordinated by the Department's Training Officer. Exhibit M. These seminars include instruction in areas such as investigation, public service, and quelling civil disturbances. Exhibit A, p.53, l.7-13; Exhibit C, p.13, l.2-4; Exhibit G, p.19, l.13-17. At the time of the incident underlying the Complaint, all of the defendant officers had also attended cultural diversity training. Exhibit G, p.21, l.5-8, l.18-23.

43. Chief Brighi, who served as head of Internal Affairs prior to becoming Chief, testified that in his seven years with Internal Affairs, the department investigated five to 10 citizen complaints each year, with about half resulting in disciplinary action, including an average of one suspension a year. Exhibit G, p.55, l.12-p.56, l.24. During his 15-month tenure as Chief, Brighi suspended one officer as the result of a citizen complaint. Exhibit G, p.52, l.22-p.53, l.1.

44. Prior to the incident underlying the Complaint, one citizen complaint was lodged against Officer Doherty. Exhibit A, p.45, l.13-19. This complaint, in which a white female alleged that Doherty had punched her while effecting her arrest, was investigated and deemed unfounded. Exhibit A, p.46, l.1-11; p.48, l.18-19.

45. Prior to the incident underlying the Complaint, Fogarty was the subject of only one citizen complaint, for making an inappropriate remark. This complaint was investigated and Fogarty received a verbal reprimand. Exhibit B, ¶. p.59, l.13-24.

46. Dekeon, who had been an officer for more than 12 years as of the date of Jeannite's arrest, had been reprimanded a handful of times prior to the arrest for minor

      infractions such as tardiness and driving out of his assigned sector.  <u>Exhibit C</u>, p.78, l.16-p.79, l.5.

47. On January 16, 2002, Kazarosian presented a notice of claim, purportedly pursuant to G.L. c.258, §4.  <u>Letter from Marsha V. Kazarosian to the Honorable John Guerin, et al.</u> ("Exhibit N").  The letter, which alleges constitutional and intentional torts by the defendant officers, <u>Id.</u>, ¶¶9, 14, contains no reference to any alleged negligence by the City or its employees, and does not allege any failure by the City to adequately train and supervise its officers.  <u>Id.</u>, generally.

                                                          DEFENDANTS

                                                          By their attorneys,

                                                          /s/Joseph L. Tehan, Jr.
                                                          Joseph L. Tehan, Jr. (BBO# 494020)
                                                          Jackie Cowin (BBO# 655880)
                                                          Kopelman and Paige, P.C.
                                                          31 St. James Avenue
                                                          Boston, MA  02116
                                                          617-556-0007

257912/METG/0549