UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JOEL JEANNITE,                              *
                                            *
                Plaintiff                   *
                                            *
v.                                          *
                                            *        C.A. NO. 04-CV-10541-RWZ
CITY OF HAVERHILL, STEPHEN BRIGHI, in       *
his capacity as CHIEF OF THE HAVERHILL      *
POLICE  DEPARTMENT, STEPHEN DOHERTY, *
GEORGE DEKEON, JR., JOHN DOE and JOHN       *
ROE,                                        *
                Defendants                  *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF JOEL JEANNITE'S OPPOSITION TO DEFENDANT' MOTION FOR SUMMARY JUDGMENT

### I. Introduction and Summary of Argument

This case involves the racially discriminatory arrest of an African-American man.  Joel

Jeannite was stopped in a classic "Terry stop" based on a 911 call, reporting suspicious activity

in the caller's neighborhood.  In the process of identifying himself to the officers present, Mr.

Jeannite produced a photo identification card which had a picture of Mr. Jeannite and his white

girlfriend affixed to its backside.  [Jeannite deposition, p. 69, Exhibit B].  Upon seeing this

picture, defendants' became offended and unlawfully seized Mr. Jeannite, violating his Fourth

Amendment right to be free from unreasonable search and seizure and Fourteenth Amendment

right to equal protection under the law.  [Jeannite deposition, p. 84, Exhibit B].

The facts, taken in the light most favorable to the plaintiff, show that Jeannite was treated

differently than a similarly situated white person would have been as evidenced by the racially

discriminatory comments that the officers made prior to the arrest.  [Jeannite deposition, p.73,

Exhibit B].  In order to justify the racial profiling and discriminatory treatment of Jeannite,

defendants have attempted to re-cast the facts to describe a traffic stop.  This was not a traffic

stop.  Therefore defendants' reliance on M.G.L.A. Chapter 90 to justify their arrest of the plaintiff is inappropriate, misplaced and irrelevant.

Not only does Mr. Jeannite have cognizable claims that his Fourth and Fourteenth Amendment rights were violated, but defendants' motion for summary judgment should also be denied based on the fact that many material facts remain contested.  Among key facts in dispute, defendants deny the racial motivation and the existence of the photo of the African-American plaintiff with a white girlfriend that is the factual basis for the plaintiff's claim.  Plaintiff asserts that there were no facts relating to the use of an automobile that provide any basis for a motor vehicle stop or request for the plaintiff's driver's license (as opposed to identification, which the plaintiff produced) nor any facts that warranted a seizure at all, be it a _Terry_ stop or an arrest.

## II. Argument

   A.    **Defendants fail to meet the Summary Judgment Standard as they do not present the facts in the light most favorable to the plaintiff in ignoring the racial basis for arresting the plaintiff.**

Summary Judgment must be sparingly granted in civil rights cases.  _Howard v. Topeka-Shawnee County Metropolitan Planning Commission_, 578 F. Supp. 534 at 536 (D.C. Kan. 1983), _Oaks v. City of Fairhope Alabama_, 515 F. Supp. 1004 at 1009 (D.C. Ala. 1981).  The procedure is "drastic and should be applied with caution to the end that the litigants will have a trial on bona fide factual disputes."  _Howard v. Topeka-Shawnee County Metropolitan Planning Commission_, 578 F. Supp. at 536.

Summary judgment may be entered only when there is no dispute as to material fact. The moving party has the burden of showing that they are entitled to judgment as a matter of law as there is no genuine issue as to material fact.  _Bromley-Heath Modernization Committee v. Boston Housing Authority_, 459 F. 2d 1067 at 1071 (1st Cir. 1972).  Here the defendants

2

conveniently ignore the evidence that they arrested the plaintiff in response to discovering that the plaintiff, an African-American, had a white girlfriend.

**B.    Defendants' motion for summary judgment should be denied because there is a dispute as to the material facts of the case and defendants failed to present the facts in the light most favorable to the plaintiff, omitting facts that indicate a racial motivation for the arrest of the plaintiff and re-casting additional facts to their advantage.**

**1.  The defendants fail to acknowledge the evidence that they stopped the plaintiff solely because he was Black.**

The facts viewed in the light most favorable to the plaintiff indicate that the defendants stopped the plaintiff because he was a "black man in a black jaguar" who knocked on a door on Union Street.  [Dekeon deposition, p. 46, Exhibit C]  The defendants then arrested the plaintiff upon discovering he had a white girlfriend, commenting "What's a good looking white chick dating a black kid like that?" [Jeannite deposition, p.73, Exhibit B][1]

Defendants equate "black man" with "suspicious man" as they grasp for "a reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity", _United States v Hensley_, 469 U.S. 221, 105 S.Ct., 679 (1985), the level of suspicion needed to justify the _Terry_ stop effected by the defendants.  Besides his race, there was nothing otherwise suspicious about the plaintiff, who was doing no more than sitting in his parked car when the defendants arrived, according to the defendants' own testimony.  [Dekeon  deposition, p. 52, Exhibit C]

Nor was there any evidence that the defendants were responding to any crime or reported crime or that a crime had been committed or was about to be committed.  When asked whether there was anything criminal about what had been reported by the 911 caller, defendant Dekeon

---

[1] The plaintiff inadvertently had showed the defendants a photograph of him with his white girlfriend on the back of his college ID card, which he produced in response to the defendants' request for identification.  [Jeannite deposition, p.73, Exhibit B]

replied, "Nothing." [Dekeon Deposition, p.48, Exhibit C]

Absent any "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity", there was no basis at all for the _Terry_ stop, other than the plaintiff's race. That is not a lawful reason for stopping the plaintiff. In fact it is an unconstitutional basis for stopping the plaintiff. Would the defendant officers have stopped a Caucasian doing nothing more than sitting in his car? Would the defendants officers have stopped a Caucasian because a civilian had reported he was knocking on doors in the neighborhood?

**2. It is a question of fact when the defendants noted the missing trunk lock.**

The defendants attempt to cloud the issue, claiming that plaintiff's car was missing the trunk lock, and "a missing trunk lock is often an indication that the car has been stolen". [Defendant's memorandum at p.7]   However, there was no report of a stolen car and, upon request, the plaintiff produced both valid identification (the college ID with the damning photo of the plaintiff and his white girlfriend) and a valid registration.

Moreover, the defendant's statement that they observed "a black Jaguar on the street with its trunk lock missing" is misleading, improperly shading the facts in a light favorable to the defendants. While it is true that the defendants observed the black Jaguar and that <u>at some point</u> they noted the trunk lock was missing, there is no evidence that they observed the missing trunk lock before stopping or before arresting the plaintiff. Thus it is a red herring, as there is no evidence that the defendants were at all aware of the missing trunk lock until after stopping the plaintiff and reacting to discovering he had a white girl friend.

The car was not stolen. There was no report of a stolen car. The defendants quickly ascertained that plaintiff Jeannite owned the car and that it was properly registered. Thus the

missing trunk lock, even if the defendants noticed it before arresting the plaintiff, a question of fact for the jury to determine, was not a basis for stopping or arresting the plaintiff. Would the defendants have suspected the car of being stolen if the driver was a white man?.

### 3. **The stop of the plaintiff was a Terry stop, not a motor vehicle stop**.

In order to find some after the fact justification for the racially based arrest, defendants attempt to recast the facts as a traffic stop. There is no factual basis to do so. The plaintiff was not stopped for anything relating to the operation of his motor vehicle. He was stopped in response to a telephone call from a citizen who reported "suspicious activity" on Union Street, where she lived. This did not involve a motor vehicle at all. The fact that the plaintiff happened to be sitting in his car at the time the defendant officers did not make it a traffic stop that permitted the defendants to demand that the plaintiff produce a drivers license.

The defendants had no right to demand that the plaintiff produce a driver's license, as it is not disputed that their justification for stopping him was a *Terry* stop. A *Terry* stop allows police officers to ask for identification, *Hiibel v Sixth Judicial Dist. Ct.*, 542 U.S. 177, ---, 124 S.CT. 2451, 2459 (2004) which the plaintiff produced, in the form of the college ID with the offending photo of the white girlfriend, but no more. Once the plaintiff produced his ID, that sufficed.

The fact that the plaintiff did or did not have his drivers license was irrelevant, as the detention and stop of the plaintiff was not a traffic violation, and thus should not be considered at all in establishing whether there was a basis for stopping and arresting the plaintiff. However, the defendants must misconstrue the stop as a traffic stop to create an after the fact excuse to justify a racially tainted stop and arrest.

Plaintiff Jeannite properly identified himself, presenting his college photo ID.  Moreover, he was not arrested after defendants had run his name and the registration of his car and had confirmed that the car was properly registered.  He was not arrested until the defendants saw the picture of the plaintiff and his white girlfriend on the back of the ID, when the defendants made racially offensive comments and ordered Mr. Jeannite out of the car, using raised voices and profanity.  Defendants omit this fact.

The defendants do not present the facts in the light most favorable to the plaintiff. Because there is a dispute as to the material facts and they have not been presented in the light most favorable to the plaintiff, defendants' motion for summary judgment must be denied.

**C.     Summary judgment should be denied because the defendants' warrantless arrest of plaintiff Jeannite based on motives of racial bias violated plaintiff Jeannite's First Amendment right of association and Fourth Amendment Right to be free from unreasonable seizure and because the racially motivated arrest violated plaintiff's Fourteenth Amendment right of Equal Protection Under the Law.**

The First Amendment of the Constitution protects the plaintiff's freedom of association and Fourth Amendment of the Constitution provides protection against unreasonable searches and seizures by the government.  Likewise, the Massachusetts Declaration of Rights Article 19 guarantees freedom of association and 14 states, "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person."

The Supreme Court has made it clear that an arrest constitutes a seizure and must be held to Fourth Amendment standards.  "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." _US v. Brignoni-Pance_ 422 U.S. 873, 878 (1975).  This test is an objective one, and no actual use of physical force is necessary.  It is enough that there has been a show of authority and an objectively reasonable submission to that authority to constitute a seizure.  _CA v. Hodari D._,, 499 U.S. 621, 627-28 (1991)

There is no dispute as to whether plaintiff was seized, or when. The facts taken in the light most favorable to the plaintiff show that a seizure occurred when the defendant officers approached and stood at either side of the driver's side door to the plaintiff's car. Viewing the facts most favorably to the plaintiff, the arrest was unconstitutional because it was based on the plaintiff's race and as such violated plaintiff Jeannite's Fourteenth Amendment right to equal protection under the law.

"Selective enforcement of motor vehicle laws on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment." _Flowers v Fiore_, 359 F.3d 24 (2004), citing _Chavez v. Ill. State Police_, 251 F.3d 612, 635 (7th Cir. 2001) To establish his equal protection claim, plaintiff must show evidence that he was treated differently from similarly situated non-African-American motorists and that the action taken against him was motivated, at least in part, by his race. See _Chavez_, 251 F.3d at 635-36, 645 and _Flowers_ at 34-35 Plaintiff is able to do so on the facts alleged.

Defendants responded to a call about a "black man in a black Jaguar". A black man in a black car does not equal or establish reasonable, articulable suspicion that a crime was or is about to be committed. Rather, it is selection for an unreasonable search and seizure based on race. By equating race with suspiciousness, defendants violated Mr. Jeannite's right of equal protection under the law. Defendants reaffirmed the racial basis for the arrest when, upon seeing the picture of Mr. Jeannite and his girlfriend on the back of his ID, they said "What is a good looking white chick dating a black kid like that?"

The facts taken in the light most favorable to the plaintiff establishes that, first, the initial stop of Mr. Jeannite was a reaction to his race. Then the subsequent arrest of Mr. Jeannite was a reaction to the fact that he had a white girlfriend. The claim that the defendants arrested the

plaintiff because he was disorderly and failed to produce a license should not even be considered if the Court properly views the facts in the light most favorable to the plaintiff.

Upon being stopped and detained, Mr. Jeannite had identified himself properly. The defendants had ascertained that the car was registered to him before they ordered him to "Get the fuck out of the car." [Plaintiff's Statement of Facts #4] Thus, there is no evidence to support any claim that plaintiff had committed any crime prior to his arrest. Consequently, for purposes of summary judgment, the Court should presume that the defendants' basis for arresting the plaintiff was that he was African-American and that he had a white girlfriend.

On these facts, summary judgment must be denied.

**D.     Defendants' motion for summary judgment should be denied because they are liable under 42 US § 1983 for acting under color of state law in a racially discriminatory manner that violated his First, Fourth and Fourteenth Amendment rights when they seized and arrested him in retaliation for his associating with a white girl.**

Plaintiff Jeannite has established a *prima facie* case of liability under 42 US §1983, which hold that anyone who, acting under color of law

> subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

As described above, defendants deprived Mr. Jeannite of his Fourteenth Amendment right to equal protection under the law as well as his Fourth Amendment right against unreasonable search and seizure. In responding to a call about a "black man in a black jaguar," (and with no other evidence that a crime had been committed or was about to be committed) the defendants, under color of law, arrested Jeannite for an offense that would have, at most, yielded a ticket for a similarly situated white person.

Viewing the evidence favorably to the plaintiff, the defendants stopped the plaintiff based on his race and then arrested him because they were offended when they saw the picture of Mr. Jeannite with a white girl.  Plaintiff also had a First Amendment right to associate with anyone of his choosing, regardless of his or her race, but the defendants' comment "What is a good looking white chick dating a black kid like that?" suggests that the defendants did not approve of his having a white girlfriend and that this was further motive for his arrest.

Even if plaintiff Jeannite yelled and otherwise vociferously expressed his displeasure at the way he was being treated, this was not disorderly conduct, as "words alone, including vulgar, profane and offensive speech, do not constitute 'conduct' cognizable as disorderly conduct." _Comm. v Sholley_, 726 NE 2d 415, 48 Mass. App. Ct. 495, review granted 733 NE2d 125, 431 Mass 1104 ( 733 N.E.2d 125, 431 Mass. 1104, (2000), affirmed in part, reversed in part 739 NE2d 236, 432 Mass 721  This is a contested fact that must be viewed in the plaintiff's favor, in light of his acquittal on that charge.  Without that charge, the defendants are left trying to justify their racially tainted arrest on the fact that the plaintiff did not have his driver's license with him.

The crucial question is not whether the defendants can find some technical basis for their arrest of the plaintiff that excuses their racially motivated conduct.   Where the civil rights claim is a fourteenth amendment equal protection claim, the question is one of selective treatment based on race.  If that is the case, even a legitimate arrest can be constitutionally defective, bthereby creating the basis for a §1983 claim, regardless of the conviction.  [See _Carrasca et al._ _v. Pomeroy et al._. 313 F.3d 828 (2002),  _Marshall v Columbia Lea Regional Hospital, et al_, 345 F.3d 1157 (10th Cir., 2003),  _Chavez v. Illinois State Police_, 251 F.3d 612, 635-36 (7th Cir. 2001); _Farm Labor Org. Comm. v. Ohio State Highway Patrol_, 308 F.3d 523, 533-36 (6th Cir. 2002) and other cases citing _Whren v. United States_, 517 U.S. 806, 116 S.Ct. 1769 (1996)]  The

9

discriminatory purpose need not be the only purpose, although it must be a motivating factor in the decision. *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996) (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U. S. 252, 265-66 (1977)

　Indeed, there is technical justification for the arrest, as failure to have one's driver's license is an arrestable offense under Massachusetts law.  This is why the defendants struggle to turn a *Terry* stop, in response to a call reporting suspicious knocking on doors, into a traffic stop. Without a traffic stop, there is no justification for asking for the plaintiff's license, only that he provide identification, which the plaintiff did.

　However, where race has reared its ugly head, the question in determining whether the defendants' arrest of the plaintiff was legitimate or racially based is not whether there was some technical grounds to justify a racially tainted arrest, but whether the plaintiff's race was the underlying basis for the arrest: whether the defendants would have treated a Caucasian differently in the same circumstances,  [See *Yerardi's Moody St Restaurant & Lounge, Inc., v Board of Selectmen*, 878 F2d 16, (1ˢᵗ Cir., 1989), which explains that an equal protection case requires proof that the plaintiff, compared with others similarly situated, was selectively treated and that the selective treatment was based on impermissible considerations such as race.]

　Defendant Dekeon provides the answer, admitting, "I'm not a big Chapter 90.  I . . . warn them rather than write them a ticket.  I give them a verbal warning." [Dekeon deposition, at 38, Exhibit C]  In other words, his practice is not only not to arrest a similarly situated Caucasian: the defendant's practice is that he would not even issue a ticket, only a warning, to a similarly situated Caucasian.  Where defendant Dekeon admits that he would not have arrested a similarly situated Caucasian for not having his license with him, then the only conclusion that can be drawn here is that the plaintiff was arrested only because he was African-American – or, worse,

10

because he had the gall to date a white girl.

Thus the facts, in a light favoring the plaintiff, show that the defendants arrested the African-American plaintiff for an offense for which a similarly situated white person most likely would have received no more than a verbal warning and at worst a $100 traffic ticket. Where a similarly situated Caucasian would not have been arrested for the same offense, this was selective enforcement based on race, in a clear violation of the plaintiff's Fourteenth Amendment right to equal protection under the law.

Thus the facts, viewed in the plaintiff's favor, demonstrate that the plaintiff was "singled …out for unlawful oppression". *Dartmouth Review v Dartmouth College*, 889 F2d 13, 19 (1st Cir., 1989) Where the plaintiff was treated differently than like situated Caucasians, summary judgment must be denied.

### E.    Defendants' reliance on *Heck v Humphrey* is misplaced where the issue is whether the defendants' arrest was racially motivated.

Defendants' argument that the plaintiff's claim is barred by *Heck v Humphrey*, 512 U.S. 483, 114 S. Ct. 2364 (1994) is misplaced. *Heck v Humphrey* holds that a party may not bring a §1983 claim that "calls into question the lawfulness" of an underlying conviction. However, the plaintiff is not challenging the underlying "conviction". Rather he is asserting that he was selectively chosen for prosecution based on his race: that compared with others similarly situated, he was selectively treated, something defendant Dekeon has admitted, and that this selective treatment was based on the impermissible consideration of his race, the standard that the defendants cite, quoting *Yerardi's Moody St Restaurant & Lounge, Inc., v Board of Selectmen*, 878 F2d 16, (1st Cir., 1989)

In explaining why *Heck v Humphrey* did not bar the claim of Hispanics that they were arrested selectively because of their race[2], despite a subsequent conviction for swimming in a park after hours, the Third Circuit held in *Carrasca et al. v. Pomeroy et al*. 313 F.3d 828 (2002)

> Even if the [defendant Park] Rangers had probable cause to arrest Plaintiffs, the District Court could not dismiss all of the federal claims based on such a finding. "The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected" for enforcement of a law. *Bradley [v United States]*, 299 F.3d 197 at 205 (3d Cir., 2002). Plaintiffs' equal protection claims under the Fourteenth Amendment require a wholly separate analysis from their claims under the Fourth Amendment.

Writing for the Third Circuit, Justice Sloviter explained that

> [J]udicial estoppel can be imposed only if: "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." *Montrose Med. Group v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001).

*Carrasca* is one of a number of cases that hold that the validity of the underlying conviction is not a bar in a selective enforcement claim under the Fourteenth Amendment selective enforcement claim.  See, also, *Marshall v Columbia Lea Regional Hospital, et al*, 345 F.3d 1157 (10th Cir., 2003) and *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001)  Thus *Heck v Humphrey* does not apply.

The growing number of cases involving racial profiling in traffic stops (such as *Chavez*, supra, and  *Gibson v. Superintendent of New Jersey Department of Law and Public Safety - Division of State Police*, 411 F.3d 427 (3d Cir., 2005)) also do not trigger *Heck v Humphrey* scrutiny, as the issue is not whether the traffic stop was valid but whether it was selectively made based upon the improper criteria of race.  That is precisely the question here and the reason why a *Heck v Humphrey* analysis is inappropriate.

---

[2] The four Hispanic defendants were among 15-25 swimmers in a lake in a state park when the defendant police arrived between 6:15 and 6:20.  The posted closing time was 6:00.  Only the four Hispanic plaintiffs were arrested.

Indeed, the _Carrasco_ Court called into question whether an arrest and detention was an appropriate law enforcement response to the "crime" of swimming in a park less than a half hour after closing time.  The arrest of plaintiff Jeannite for a traffic offense that defendant Dekeon normally disdains and does not enforce raises a similar question of fact for the jury.

Even more on point than _Carrasco_ are the facts in _Marshall_, where the defendant police officer contended that the African-American plaintiff failed to stop at a stop sign.  The Ninth Circuit found that even if an observed, though unspecified, traffic violation "provided sufficient cause for the stop for the arrest", that did not insulate a police officer from a racially based stop, writing

> that Mr. Marshall's stop and arrest were based on probable cause does not resolve his more troubling claim that he was targeted by [defendant] Officer Porter on account of his race. In _Whren v. United States_, 517 U. S. 806, 813 (1996), the Supreme Court held that claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment. As the court noted in _United States v. Avery_, 137 F.3d 343, 352 (6th Cir. 1997), "[t]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."

> Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment. .See generally William Nelson, The Fourteenth Amendment: From Political Principle to Judicial Doctrine 43-48 (1988); John Frank & Robert Munro, The Original Understanding of "Equal Protection of the Laws," 1972 Wash. U. L.Q. 421, 445-46. In its modern form, however, racially selective law enforcement has only recently come to public attention, and state and federal law enforcement authorities are struggling to develop practical means for distinguishing between legitimate and illegitimate uses of race in the investigation and prevention of crime. See generally Samuel R. Gross & Debra Livingston, Racial Profiling Under Attack, 102 Colum. L. Rev. 1413 (2002); Albert W. Alschuler, Racial Profiling and the Constitution, 2002 U. Chi. Legal F. 163 (2002). Recently at the behest of President Bush, the Department of Justice promulgated guidelines designed to end racial profiling in federal law enforcement. See Department of Justice, Fact Sheet on Racial

Profiling (June 17, 2003), available at http://www.usdoj.gov/opa/pr/2003/June racial_profiling _fact_sheet.pdf (last visited Aug. 12, 2003).

The First Circuit has acknowledged this language from _Whren v. United States_, 517 U.S. 806, 116 S.Ct. 1769 (1996), that "selective enforcement of motor vehicle laws on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment." See _Flowers v. Fiore_, 359 F.3d 24 at 34-35 (1st Cir., 2004). (although finding for the defendants, on the grounds that plaintiff Flowers did not provide evidence of selective enforcement)

Plaintiff Jeannite does not contest that, where there is probable cause for the underlying traffic stop, there can be no argument that the constitutional reasonableness of traffic stops depends on the motivation of the individual officers.  However, here there was no probable cause whatsoever for the underlying traffic stop.  In fact, the stop was not even a traffic stop: it was a _Terry_ stop, arguably for which there was no justifying articulable suspicion.  Even assuming that the initial _Terry_ stop was proper, once the plaintiff identified himself and explained his presence, there was no legitimate basis to hold him further, and certainly no basis to arrest him, unless he was arrested selectively for having a white girlfriend.

This, and not a _Heck v Humphrey_ analysis of issue preclusion, is the proper analysis of the Fourteenth Amendment equal protection claim.  It leaves a question of fact for the jury to determine regarding the motive for the arrest: whether the arrest on this charge was motivated by the offense that the officers took at seeing the interracial couple which sparked the comment, "What's a good looking white chick dating a black kid like that?"

Plaintiff's §1983 claim is not precluded by the holding in _Heck v Humprey_ where there was a racial motivation for the arrest.  _Heck v. Humprey_, whose preclusion of §1983 claims after conviction is to limit the remedy of incarcerated persons to _habeas corpus,_ is not applicable here. Since plaintiff is not and was not incarcerated, _habeas corpus_ is not and was not available to him

14

or relevant.  The only route available for him to address the police misconduct under the color of

law inherent in the racial bases for his stop and arrest is a §1983 claim.  In order to comport

with the public policy purpose of the statute, he must be allowed to pursue it.

Thus, as explained above, plaintiff's conviction for a motor vehicle infraction does not

insulate defendants from prosecution where racial discrimination is involved. Plaintiff Jeannite's

conviction under MGLA 90 § 25, as a race-based abuse of discretion, does not bar his Fourth

and Fourteenth Amendment claims because of the racial discrimination involved.  [See

*Carrasca*, *Marshall*, and *Gibson* supra]

In *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536 (2001), the Supreme

Court pointed out that individualized review may be granted to an arrestee whose arrest was,

"conducted in an extraordinary manner, unusually harmful to [his] privacy or even physical

interests."  In this case, the discriminatory behavior of defendants toward the African-American

plaintiff, Mr. Jeannite, based, first on his race and then escalated on the discovery that he was

involved in an interracial relationship, was both extraordinary and unusually harmful to his

privacy.  While the Supreme Court did not find that the arrest in *Atwater* violated the Fourth

Amendment ban against unreasonable seizures, the Court recognized that there must be an

exception afforded to address the problem of racial discrimination.

In both *Atwater* and *Pomeroy* the court demonstrated that without special recognition and

remedies for racial discrimination in the area of police misconduct relating to citizens' Fourth

and Fourteenth Amendment rights, subtler forms of modern racism will go unfettered.  That is

precisely the situation here, where, unlike the plaintiff in *Flowers v Fiore*, plaintiff Jeannite has

provided ample evidence of racial animus behind his arrest, most particularly the defendants'

own words, "What's a good looking white chick dating a black kid like that?"

The Fourth and Fourteenth Amendment protections afforded the plaintiff's right to equal protection under the law and to be free from unreasonable seizure based upon his race, as recognized in *Atwater v City of Lago Vista* , *Flowers v Fiore*, *Carrasca et al. v. Pomeroy et al.*, and other cases cited above, cannot be ignored, as the defendants would have the Court do here to reach summary judgment.  For this reason, the issue preclusion requirements of *Heck v Humphrey* are not relevant to the instant case, as (1) the plaintiff does not challenge or seek to set aside his conviction  for not having his license and (2) the conviction does not justify the violation of the plaintiff's equal protection claim.

For this reason, the issue preclusion requirements of *Heck v Humphrey* do not apply here and cannot be used as a basis for summary judgment in this equal protection claim.

**F.    There is no qualified immunity for racial discrimination**

The Fourteenth Amendment of the Constitution provides for equal protection under the law.  This prohibits selective enforcement of the law based on considerations such as race. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769 (1996)  This was well established law at the time of the defendants' arrest of the African-American plaintiff  because he had a white girlfriend.   Likewise, the First Amendment provides for freedom of association.  Racial integration is well established such that it clear that African-Americans are entitled to associate with Caucasians.  Miscegnation laws have long been banned as unconstitutional.

The defendants cannot suggest that they did not know it was a violation of the law to stop someone based on his race or to arrest an African-American because he had a white girlfriend.  Thus they "must have known that they were acting unconstitutionally " [Wagner v City of Holyoke, 404 F3d 504 at 509 (1st Cir., 2005),  emphasis in original] and are not entitled to qualified immunity.

**G.    Offering to dismiss criminal charges in return for the plaintiff's surrender of his civil rights claims is an independent violation of the plaintiff's civil rights not subject to the _Heck v Humphrey_ defense.**

In Massachusetts, a covenant to give up civil rights claims against police officials voluntarily negotiated in exchange for a decision not to prosecute the claimant on a criminal charge is void as against public policy. _Foley v Lowell Div. Of Dist. Court Dept of Trial Court_, 398 Mass. 800, 501 N.E.2d 1151 9 (1986)  Following the then valid First Circuit holding in _Rumery v Newton_, 778 F2d 66 at 68 (1ˢᵗ Cir., 1985), the Supreme Judicial Court explained "Although we recognize the latitude which prosecutors necessarily must have in determining whether to prosecute criminal charges, a criminal defendant's decision to assert a civil rights claim is not a factor which the prosecutor should consider."

Although the Supreme Court subsequently narrowed the First Circuit's holding in _Rumery_ by stating that release-dismissal agreements are not **_Per Se_** inherently coercive or unconstitutional, 480 U.S. 386, 393, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987),[3] holding that the particular release that Rumery signed was voluntary and not coerced, the _Foley_ holding is still the law in Massachusetts.  It has been followed in the oft cited _Hall v Ochs_, 623 FSupp 367 (1986), decided several months after the Supreme Court ruled in _Rumery_, and remains well established law in Massachusetts.

Certainly, defendant Brighi was well aware of the standard reiterated in _Hall v Ochs_, where the Court directed a verdict that offering to release Hall and dismiss criminal charges in return for a release of civil rights claims violated Hall's civil rights, writing that although "[t]he Supreme Court rejected the proposal that the exchange of a covenant not to sue in return for dropping criminal is _Per Se_ unenforceable", it must be voluntary and cannot be coerced.

---

[3] Over stiff dissent of Stevens, joined by Brennan, Marshall and Blackmun

Defendants, in their memorandum [pp. 13-16], speak of the reputation and skills of plaintiff's criminal defense counsel, Marsha Kazarosian, and dubs defendant Brighi's proposed deal as one of "compassion for Jeannite's situation".  [p.13]  Defendants do acknowledge that Brighi offered the "deal" even before Ms. Kazarosian suggested any civil suit, requesting "assurance from Kazarosian that she would not 'bring some type of a lawsuit against the City after I grant your wish and try to get this case dismissed'."

Whether that was sufficient coercion to constitute a Constitutional violation is a question of fact for the jury.  Certainly there is evidence to suggest that, contrary to defendants' assertion, Brighi or other defendants did communicate with the prosecuting attorney demanding that the case not be dismissed [See Exhibit A, hereto, with handwritten notation "Would not take CWOF! DO <u>NOT</u> DISMISS." [emphasis in original], Plaintiff's Statement of Contested Fact, no. 9], in an attempt to interfere with the criminal prosecution to protect the officers at risk of being sued for constitutional violations

If there was no racial taint to the arrest, why would the defendants solicit a deal that involved civil rights claims?

**H.    Plaintiff's state civil rights claims survive even if Federal claims are dismissed under *<u>Heck v Humphrey</u>*, or qualified immunity, as they do not apply to the MCRA.**

The Massachusetts Civil Rights Act, M.G.L., c. 11 §H et seq,  ['MCRA"] is intended to be a broad remedy, to be liberally construed.  *Batchelder v. Allied Stores Corp.*, 473 NE2d 1128, 393 Mass. 819 (1985)  While the Supreme Judicial Court has indicated that the MCRA is remedy under M.G.L.823  c. 12, § 11I, "coextensive" with 42 U.S.C. § 1983, *Batchelder* supra, this was intended to extend, not limit, the application of the state civil rights act when it was made twenty years ago, before the United States Supreme Court began to limit the broad

application of constitutional protections, through its application of qualified immunity and cases like *Heck v Humphrey*. There is no basis to apply these and other restrictions to the state MCRA or any reason to think the Massachusetts Supreme Judicial Court would adopt them. Thus restrictions which have been judicially imposed upon the Federal civil rights act, 42 U.S.C. § 1983, such as the bar to bringing a claim after conviction, do not necessarily apply to the MCRA.

To the contrary, there is a growing body of Massachusetts law that provides greater civil rights protections under the Massachusetts Declaration of Rights than is afforded under the United States Constitution. As the Supreme Judicial Court pointed out in *Jenkins v. Chief Justice of Dist. Court Dept.,* 416 Mass. 221, 619 N.E.2d 324 (1993), "It is by now firmly established that, in some circumstances, Article 14 affords greater protection against arbitrary government action than do the cognate provisions of the Fourth Amendment." See also, *Com. v. Gonsalves*, 711 N.E.2d 108 Mass (1999), *Com. v Torres*, 424 Mass. 153, 674 N.E.2d 638 (1997), *Com. v King*, 389 Mass. 233, 449 N.E.2d 1217 (1983) *Com. v Loughlin*, 385 Mass. 60, 430 N.E.2d 823 (1982), *Com v Alvarez*, 44 Mass.App.Ct. 531, 534, 692 N.E.2d 106 (1998) *Com v Ellsworth*, 41 Mass.App.Ct. 554, 671 N.E.2d 1001 (1996), *Com. v Kimball*, 37 Mass.App.Ct. 604, 641 N.E.2d 1066 (1994).

While *Heck v Humphrey* has narrowed the availability of Federal Fourth Amendment claims to plaintiffs under § 1983, the search and seizure provisions of the Article 14 the Massachusetts Declaration of rights under the MCRA remain broad and inclusive. They are not precluded by the technicality of a traffic offense resulting in a $100 fine and remain a remedy to racially discriminatory arrests even if *Heck v Humphrey* or qualified immunity were to pose such a bar to a §1983 Federal claim. Moreover, *Heck v Humphrey* does not apply to state equal

protection claims or freedom of association as guaranteed by Article 19 of the Massachusetts Declaration of Rights.

Likewise, while the Supreme Judicial Court has adopted the notion of qualified immunity, there is no reason to think that qualified immunity would apply in a case of racial profiling that violates the plaintiff's right to equal protection under the law, a clearly established right under the state as well as federal constitution. Plaintiff Jeannite is a member of a protected class and the law was selectively applied to him based on that class. As such, the MCRA offers him an avenue for redress irrespective of his conviction even if his First, Fourth and Fourteenth Amendment rights are limited by Federal caselaw.

Finally, the notion the defendants behavior did not constitute sufficient threats, intimidation or coercion is wrong. Case law is clear that a false arrest "is intrinsically coercice fro MCRA purposes". *Seitins v Joseph*, 328 Fsupp2d 366, 378 (D.Mass 2003) citing *Scott v Macy's East., Inc.*, 2002 WL 31439745 (D.Mass. 2003) and *Sarvis v Boston Safe Deposit and Trust Co.*, 711 NE2d 911, 918 (1999)

**III. Conclusion**

For the reasons set forth herein, the defendant's motion for summary judgment should be denied.

                                                    Plaintiffs, by counsel,


Date: 11/7/05                                       /s/ Andrew M. Fischer
                                                    Andrew M. Fischer,
                                                    BBO # 167040
                                                    JASON & FISCHER
                                                    47 Winter St., 4th Fl.
With the assistance of                             Boston, MA 02108
Brandyn Keatring, law student                      (617) 423-7904