EXHIBIT

A

```
                          VOLUME:  I
                          PAGES:  1 through 136
                          EXHIBITS:  See Index
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

************************************

JOEL JEANNITE,                      )
                  Plaintiff,        )
                                    )
                                    )
      VS.                           )
                                    )
CITY OF HAVERHILL, STEPHEN BRIGHI,  )  C.A. NO.:
in his capacity as CHIEF OF THE     )  04-10541-RWZ
HAVERHILL POLICE DEPARTMENT,        )
STEPHEN DOHERTY, GEORGE DEKEON, JR.,)
JOHN DOE, and JOHN ROE,             )
                  Defendants.       )

************************************

ORIGINAL

DEPOSITION OF STEPHEN J. DOHERTY, JR.,
a witness called on behalf of the Plaintiff, taken
pursuant to the provisions of the Federal Rules
of Civil Procedure, before Sheila M. Duffy, a
Registered Professional/Certified Shorthand
Reporter (#146199) and Notary Public in and for
the Commonwealth of Massachusetts, at the offices
of Jason & Fischer, 47 Winter Street, Boston,
Massachusetts, on Tuesday, February 22, 2005,
commencing at 10:06 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

64

1    an arrest that day?

2         A.    No.

3         Q.    Do you recall being dispatched that

4    day?

5              MR. TEHAN:  Well, at all?

6              MR. FISCHER:  Yes.

7         A.    Do I recall, no, but I am sure we were.

8         Q.    Do you recall the incident involving

9    the arrest of my client?

10        A.    Yes.

11        Q.    And where did that incident take place?

12        A.    Union Street.

13        Q.    And that would be --

14        A.    Which --

15        Q.    -- where would that be located on

16   Exhibit A?

17        A.    Right here.

18        Q.    Do you want to circle it?

19        A.    (Witness complies.)

20              I can't see the street, but I see the

21   name.

22        Q.    Okay.  And it's more accurately or more

23   clearly depicted on Exhibit B?

24        A.    Yes.

65

1      Q.    And can you tell us what caused you to

2    go to Union Street on that day?

3      A.    There was a dispatch call 11 Union

4    Street.

5      Q.    Do you recall the dispatch call?

6      A.    Not exactly.  Basically, --

7      Q.    You were in a car with a partner?

8      A.    Correct.

9      Q.    Who was your partner?

10     A.    Glen Fogarty.

11     Q.    You recall being dispatched to Union

12   Street?

13     A.    No.

14     Q.    What do you recall?

15     A.    There was a dispatch that went to Car

16   No. 5 of suspicious activity, a black male driving

17   a black Jaguar was -- came to 11 Union, asking

18   questions.  He was there the day before as well,

19   asking questions.

20     Q.    And why was that suspicious activity?

21           MR. TEHAN:  I'll object.

22     A.    Why is that suspicious activity?

23     Q.    Yes -- strike that.  What was

24   suspicious about that activity?

66

1      A.    Someone going to the same house twice

2  and doesn't know the person who lives there, I

3  think that is pretty suspicious.

4      Q.    Did you know he didn't know the person

5  who lives there?

6      A.    The person called from there.

7      Q.    Who was the person who called?

8      A.    I don't recall.

9      Q.    Did you speak to the person who called?

10     A.    No.

11     Q.    Do you know who spoke to the person who

12  called?

13     A.    Yes.

14     Q.    Who spoke to the person that called?

15     A.    The dispatcher.

16     Q.    Okay.  And you don't know who that

17  person was?

18     A.    Excuse me?

19     Q.    You don't know who that person was?

20     A.    Who the dispatcher was?

21     Q.    No, who the person that called was.

22     A.    No.

23     Q.    Who was the dispatcher?

24     A.    Officer Samenski.

67

1        Q.    And how did you know that that person

2  had called the day before?

3        A.    That is what went out as the

4  transmission, as the dispatch transmission.

5        Q.    I'm sorry.  Say that again to me?  I'm

6  not following you.

7        A.    The dispatch transmission went out --

8  that they gave a description of a car, he was

9  there today, he had been there the day before as

10  well, asking questions, and the woman thought it

11  was unusual.

12        Q.    Okay.  Did the fact that it was a black

13  Jaguar attract your attention for any reason?

14        A.    No.

15        Q.    Or the fact that it was a Jaguar?

16        A.    No.

17        Q.    So, you received the dispatch?

18          MR. TEHAN:  I will object.  I think

19  he was making a technical distinction.  Please

20  clarify for him.

21        A.    No, we never received the dispatch.

22        Q.    Who received the dispatch?

23        A.    Car No. 5.

24        Q.    And who was in Car No. 5?

68

1      A.    Officer DeKeon.

2      Q.    Okay.  So, if Car No. 5 received the

3  dispatch, what caused you to go to the area?

4      A.    We were in the immediate area, so we

5  were just driving through the area to see if we

6  could locate the vehicle.

7      Q.    So, you heard the dispatch?

8      A.    Correct.

9      Q.    And since you were nearby and didn't

10  have any other pressing issue -- pressing item to

11  attend to you, thought you'd come to the area?

12      A.    We were already in the area.

13      Q.    When you say -- what do you mean by the

14  area?

15      A.    We were at White Street and Nichols

16  Street.

17      Q.    You were at White Street and Nichols.

18  Can you show where that is on Exhibit B?

19      A.    That's right here.

20      Q.    You want to put like a little car with

21  your car number on it?

22      A.    (Witness complies.)

23      Q.    I thought you'd put a little block.

24            And can you put an X in a circle for

69

1    the address where was the dispatch?

2        A.    An X and an arrow?

3        Q.    An X in a circle.

4        A.    Oh, an X in a circle.

5              (Witness complies.)

6        Q.    So, you were basically a block or two

7    away?

8        A.    Yeah, we were one street away.

9        Q.    Okay.  And so you thought you could be

10   helpful by following -- going to the scene?

11       A.    Yeah, just checking the area.

12       Q.    What time of day was it?

13       A.    8:00 at night.

14       Q.    Was it still light?

15       A.    Yes.

16       Q.    What was the weather?

17       A.    It was clear, clear day.

18       Q.    Can you tell me a little bit about this

19   section of this neighborhood?

20            MR. TEHAN:  Well, I will object as

21   vague.  He gave you two streets, the whole area.

22   I didn't quite follow you.  I'm sorry.

23       Q.    Well, the area between 97 and let's say

24   9th through 10th Street, is that a particular

70

1    neighborhood?

2        A.    Is that where you are talking about?

3        Q.    Yeah.

4        A.    Is that a particular neighborhood?

5    Yes.

6        Q.    What would that particular neighborhood

7    be?

8        A.    That's described as the Acre

9    neighborhood.

10        Q.    And how would you describe the Acre

11    neighborhood?

12        A.    How would I describe it?

13        Q.    Demographically.

14        A.    Clarify what you mean by

15    demographically?

16        Q.    Well, rich, poor, urban, rural, white,

17    non-white?

18        A.    It's urban.

19        Q.    Okay.  And what kind -- how would you

20    describe the racial mixture of the people who live

21    there?

22        A.    It's mixed.

23        Q.    And so you followed up Nichols Street?

24        A.    Correct.

71

1        Q.    To Union Street?

2        A.    No, to 4th Avenue.

3        Q.    Okay.

4        A.    To Union.

5        Q.    Okay.  And what did you see when you

6 turned on to Union Street?

7        A.    We saw a black Jaguar.

8        Q.    What else did you see?

9        A.    We saw a black male outside the Jaguar

10 with his hands inside the Jaguar.  We observed the

11 trunk lock popped on the car.  The car was in the

12 center of the street.

13        Q.    Were there any other police officers

14 there?

15        A.    No.

16        Q.    Were you the first officers to arrive?

17        A.    Correct.

18        Q.    And when you say the black male's hands

19 were in the Jaguar, where were they in the Jaguar?

20        A.    The car was stopped and there was a

21 male leaning on the window like this, with his

22 hands in the car like this so we couldn't see

23 them.

24        Q.    In the driver's side window?

72

1       A.    Correct.

2       Q.    Could you figure out what he was doing?

3       A.    No.

4       Q.    What do you think he might be doing?

5       A.    Drug activity.

6       Q.    What made you think that?

7       A.    Because of the area, and that's

8 consistent with drug activity.  When they deal

9 drugs to cars, cars pull up, they reach in the car

10 so you can't see their hands, and then they leave.

11       Q.    So, your first presumption or your

12 first suspicion was this might be drug activity?

13       A.    Probably drug activity, correct.

14       Q.    Now, at some -- would you describe the

15 black male?

16       A.    The black male outside the car?

17       Q.    Yes.

18       A.    He just -- a young man, short hair,

19 that's about it.

20       Q.    You say the trunk popped?

21       A.    The trunk lock was -- we call it

22 popped.  It was missing.

23       Q.    The key cylinder was missing?

24       A.    Correct.

73

1    Q.    And what did you next observe?

2    A.    As we -- what did we next observe?

3    Q.    Yes.

4    A.    At that point we observed the black

5    Jaguar, so we figured we had the car.  It was in

6    front of 11 Union Street.  The call was from

7    11 Union Street, black Jaguar.  So, we pulled

8    in behind the car.

9    Q.    And what did the black male do as you

10   did that, if anything?

11   A.    The black male in the -- peering in the

12   car?

13   Q.    Yes.

14   A.    As we pulled in behind the car, he

15   looked at us and he left, he walked away.  He

16   walked away towards Union Park, at which time we

17   activated our lights.  Doesn't have Union Park on

18   there.

19   Q.    Maybe you could put Union Park on this?

20   A.    Union Park's this little area right

21   here, the encircled area, right next to that,

22   right next to the X.  See how that area's

23   enclosed?

24   Q.    Yeah.

74

1          A.      That's Union Park.

2          Q.      Okay.  Between 4th Street --

3          A.      Well, that's not -- it's between North

4    and Union because 4th is in a bad spot.

5          Q.      Okay.

6          A.      That 4th goes down to there, so it's

7    actually between 4th, Union and North, it's that

8    box.

9          Q.      Okay.  So, the first black male you

10   observed walked away?

11         A.      He was the only black male we observed

12   at that time.

13         Q.      He walked towards Union Park?

14         A.      Correct.

15         Q.      What happened next?

16         A.      We activated our lights, pulled in

17   behind the Jaguar.  The Jaguar started up and

18   started, and put the car in drive and started to

19   drive away.

20         Q.      So, the black male who walked away

21   wasn't the operator of the Jaguar?

22         A.      Correct.

23         Q.      And what happened when the Jaguar --

24   where did the Jaguar go?

75

1         A.    It started to pull forward.  At that
2    time I was already out of the car and I told the
3    operator to stop the car and put his hands out of
4    the car.
5         Q.    And did he do that?
6         A.    Yes, he did.
7         Q.    Can you describe the operator of the
8    car?
9         A.    Yes, he was young black male wearing
10   like gym shorts and a tee shirt.
11        Q.    Okay.  Can you describe him any other
12   way?
13        A.    No, not really.  I couldn't get his
14   height or anything like that while he was seated,
15   so --
16        Q.    Well, based on -- did you observe him
17   after he was seated?  At some point did he get out
18   of the car?
19        A.    Yes.
20        Q.    Were you able to make any other
21   observations about him?
22        A.    Yes.
23        Q.    And what else can you tell me about the
24   way he appeared?

76

1      A.    As far as his appearance?

2      Q.    Yes.

3      A.    He was relatively short, probably

4  five-six. He was slender, probably 145, 150

5  pounds or so, that's about it.

6      Q.    And I'm going to ask you to do, if

7  you would be kind enough to do a sketch of Union

8  Street, and what I'm interested in, can you show

9  cars parked on either side, if they are parked on

10  either side, how wide it is, is it two ways, and

11  where and in relation to that layout of the street

12  can you put where the Jaguar was?

13          MR. TEHAN:  I will object.  I won't

14  stop you from doing so.  I'd interpose, I think, a

15  normal objection that he doesn't profess to be a

16  commercial artist and the rendering would not be

17  to scale.

18          MR. FISCHER:  I agree with that.

19          MR. TEHAN:  Then you may proceed as

20  best you can.

21      A.    Just one quick thing --

22          MR. TEHAN:  Well, draw the best you

23  can.  He will ask you some questions, nothing

24  informal, so to speak.  Go as far as you can.

1        Q.    Is that where the Jaguar was?

2        A.    Mm-hmm.

3        Q.    Why don't you put J-a-g for Jaguar.

4        A.    (Witness complies.)

5        Q.    These were parked cars?

6        A.    Yeah, for the most -- I don't remember

7    exactly where the cars were, but the street is so

8    narrow, that it is two-way traffic, but you can't

9    get two cars -- when cars are parked on both sides

10   you can't get cars to drive by each other.

11       Q.    Okay.

12       A.    So, --

13       Q.    Were the cars parked opposite so there

14   was no parking spaces, or it was hard to find a

15   parking space, or were there a few parked cars on

16   the street and spaces available?

17       A.    I don't really recall if there was any

18   parking spots available.  The street primarily is

19   full with cars for the most part.  It's a lot of

20   multi-families are there.  The cars, most of them

21   are on-street parking.  So, I don't, I don't

22   recall if there was any parking spaces on that

23   particular day.

24       Q.    But, your knowledge of that street is

78

1    that generally it's parked up on both sides?

2         A.    Generally, correct.

3         Q.    And you have got to be slow going down

4    because you don't know what's going to come the

5    other way and you're going to have to --

6         A.    Correct.  It's a short street.  The

7    street is a very short street.  There's probably

8    only five or six houses on this street.  So, it's

9    a short street, but when traffic -- when there is

10   cars parked on both sides only one car can fit

11   through there because it is a narrow street.

12        Q.    You don't know how long the Jaguar had

13   been there before you got there?

14        A.    No.

15        Q.    How long did you think it was from the

16   time you got the dispatch to the time that you got

17   there?

18        A.    Maybe a minute, minute and a half.

19        Q.    And when you got there you say you saw

20   someone leaning in the driver's side window?

21        A.    Correct.

22        Q.    And he left?

23        A.    Correct.

24        Q.    And you didn't pursue him?

79

A.    Correct.

Q.    You have no idea who he was?

A.    Correct.

Q.    Or what happened to him?

A.    Correct.

Q.    Or what business he had with the driver of the car, if any?

A.    That's correct.

Q.    You went after the driver of the car?

A.    Correct.

MR. TEHAN:  Objection.

Q.    You activated your lights as he started to proceed?  He stopped?

A.    (Witness nods head.)

Q.    How far did he move?

A.    Not very far, a few feet.

Q.    Basically, he responded to you immediately?

MR. TEHAN:  Objection.  He spoke of two things, a light and a verbal command.  I object to vague.

A.    He didn't stop when we activated our lights.  He stopped when I had exited my car and I told him to stop.

80

1        Q.    You were already outside the car when

2   the lights were activated?

3        A.    No.

4        Q.    So, you got out of the car after the

5   lights were activated?

6        A.    Correct.

7        Q.    And told him to stop, and he stopped?

8        A.    Correct.

9        Q.    And what happened next?

10        A.    I approached the driver's side window.

11   I asked the operator of the motor vehicle for

12   license and registration.  He immediately stated,

13   why am I being stopped, you know, in an abrupt

14   manner.  I again asked him for his license and

15   registration.

16        Q.    Under what basis were you asking him

17   for his license and registration?

18        A.    Under what basis?

19        Q.    Yes.

20        A.    We were conducting a threshold inquiry,

21   so we wanted to know who we were dealing with.  We

22   had stopped the car.  We want to know who we are

23   talking to.  That could be a stolen car that we

24   are dealing with right here.  We don't know.

Case 1:04-cv-10541-RWZ   Document 43-2   Filed 11/07/2005   Page 19 of 23

1          Q.     Did you think it was a stolen car?

2          A.     It was possible it was a stolen car.

3          Q.     At the time did you think it was a

4     stolen car?

5          A.     That was one of our -- yes, that was

6     one of the things that we were alerted to, yes.

7          Q.     What alerted you to that?

8          A.     The trunk being popped.

9          Q.     Did you have the facility to run the

10    plate from your cruiser?

11         A.     Did we have the facility?  You mean do

12    we have computers in the car?

13         Q.     Yes.

14         A.     Yes, we do.

15         Q.     And how long would it take you to run

16    the plate?

17         A.     It varies.  It's a mobile unit, so it

18    could take several minutes, sometimes it comes

19    right back.  It varies.

20         Q.     Did you or Officer Fogarty make any

21    effort to run the plate?

22         A.     Not to my knowledge, no.

23         Q.     I take it he was driving?

24         A.     He was driving.

82

1          Q.      He's able, but he is stopped behind the

2     vehicle while you are outside the vehicle?

3          A.      We both exited the vehicle at the same

4     time.

5          Q.      And no one went back to check the

6     plate?

7          A.      No.

8          Q.      Did the operator produce a license and

9     registration?

10         A.      No.

11         Q.      What did he -- what did he offer --

12    what did he say or what did he do in response to

13    your asking for license and registration?

14         A.      He stated in a very agitated manner,

15    after -- are we going back to the original, going

16    back to the original stop --

17                 MR. TEHAN:   Too many questions.  Why

18    don't you do that if it is okay okay with my

19    brother?

20         Q.      When you got out of the car you came up

21    and asked him for license and registration?

22         A.      Okay.  He says why are you stopping me.

23         Q.      And what did you say?

24         A.      I said license and registration.

83

1   Q. And what did he say?

2   A. He says, you're only stopping me

3 because I am a black man in a black car.

4   Q. And what did you say?

5   A. At that time I explained to him why he

6 was being stopped, that we were dispatched there,

7 that we got a call that there was suspicious

8 activity in the area, they gave your description

9 of your -- a similar description of your car, you

10 match the description, so that's what we are

11 doing.

12   Q. What happened, what did he say?

13   A. The entire time I was telling him why

14 we were stopping him he was continuing to talk

15 over me, says we were harassing him, we were only

16 stopping him because he was a black kid in a black

17 car.

18   It wasn't like he responded to what I

19 had said at all.  It was like he didn't hear a

20 single thing I said.

21   Q. You say he was in an agitated -- he

22 responded in an agitated manner?

23   A. Correct.

24   Q. What do you mean by agitated?

136

1                   C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    SUFFOLK, SS.

5              I, Sheila M. Duffy, a Notary Public

6    in and for the Commonwealth of Massachusetts,

7    do hereby certify:

8              That STEPHEN J. DOHERTY, JR., the

9    witness whose testimony is hereinbefore set forth,

10   was duly sworn by me and that such testimony is a

11   true and accurate record of my stenotype notes

12   taken in the foregoing matter, to the best of my

13   knowledge, skill and ability.

14             IN WITNESS WHEREOF, I have hereunto

15   set my hand and Notarial Seal this 15th day of

16   March, 2005.

17

18                        SHEILA M. DUFFY
                          RPR/CSR #146199
19                        Notary Public

20

     My Commission Expires:  January 17, 2008
21

22   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
23   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
     DIRECTION OF THE CERTIFYING REPORTER.

24

1

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

DATE: March 15, 2005

TO:     Joseph L. Tehan, Jr., Esquire
        Kopelman & Paige, P.C.
        31 St. James Avenue
        Boston, Massachusetts 02116


IN RE: JOEL JEANNITE VS. CITY OF HAVERHILL, ET AL
       DEPOSITION OF STEPHEN J. DOHERTY, JR.
       VOLUME I

Dear Attorney Tehan:

        Enclosed herewith is your copy of
the transcript of the deposition of STEPHEN J.
DOHERTY, JR., VOLUME I, PAGES 1-136, taken on
February 22, 2005, in the above-mentioned case.
Also enclosed herewith are the signature pages.
Would you kindly arrange to have Mr. Doherty read
the transcript and sign the signature page and
return it to Attorney Fischer as soon as possible.
Any changes or corrections are to be made
separately on the enclosed errata sheet signed by
the witness.  Please include any errata sheet with
the signature page.
        Thank you for your anticipated
cooperation.  If you have any questions,
please feel free to call on me.

                        Very truly yours,


                        SHEILA M. DUFFY
                        RPR/CSR #146199

Enclosure
CC: Andrew M. Fischer, Esquire
File