

1

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
617-423-5841

2

3

DATE:    July 15, 2005

4

TO:      Kopelman & Paige, P.C.
         ATT: Joseph L. Tehan, Jr., Esquire
         31 St. James Avenue
         Boston, Massachusetts 02116

5

6

7

IN RE:   Jeannite VS City of Haverhill, et al

8

Dear Mr. Tehan,

9

10        Enclosed herewith is your copy of the
transcript of the depositions of GEORGE DEKEON,
JR. and GLENN FOGARTY, taken on Friday, July 8,
2005, in the above-mentioned case

11        In compliance with Rule 30 (e), the
witness will read the transcript and sign the
signature page and errata sheet and return them as
soon as possible to the respective attorneys
involved.  Any changes or corrections are to be
made separately on the enclosed errata sheets
signed by the witness.

12

13

14        If the witness has not read and signed
the transcript and returned it to the parties
involved within thirty days, the transcript will go
in as testified to under oath

15

16        Thank you for your anticipated
cooperation.  If you have any questions, please
feel free to call on me.

17

18

19                            Very truly yours,

20                            Patricia M. Haynes

21

22  CC: Andrew M. Fischer, Esquire

23

24

COPLEY COURT REPORTING, INC.
(617) 423-5841

1

2

Volume 1
Pages 1-110
Exhibits per index

3

4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

5

6

Civil Action No. 04-10541-RWZ

7

8

-----------------------------:
                             :
9

Joel Jeannite                :
                Plaintiff,   :
                             :

ORIGINAL

10

V.                           :
                             :

11

City of Haverhill, et al     :
                Defendants.  :

12

                             :
-----------------------------:

13

14

15

DEPOSITION OF GEORGE DEKEON, JR., a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,

16

before Patricia M. Haynes, a Certified Shorthand
Reporter and Notary Public in and for the

17

Commonwealth of Massachusetts, CSR No.: 14620F, at
the offices of Jason & Fischer, 47 Winter Street,

18

Boston, Massachusetts, on Friday, July 8, 2005,
commencing at 10:15 a.m.

19

20

21

22

Copley Court Reporting
101 Tremont Street

23

Boston, Massachusetts  02108
(617) 423-5841

24

1          A.    I don't recall.  It was a question that

2      came up and I don't recall.

3          Q.    Let me bring you back.  When you make an

4      arrest, are you obliged to note the race or

5      ethnicity of the person you arrest?

6               MR. TEHAN:  Currently?

7               MR. FISCHER:  Yes.

8      BY MR. FISCHER:

9          A.    Yes.

10         Q.    How long has that been the procedure?

11         A.    Since I became a police officer.

12         Q.    Do you know what the reason for doing

13     that is?

14         A.    No, I don't.

15         Q.    What do you think is the reason for doing

16     that?

17               MR. TEHAN:  Objection.

18     BY MR. FISCHER:

19         A.    I don't know.

20         Q.    Do you write traffic citations?

21         A.    Not a lot now.  I haven't written too

22     many citations.

23         Q.    But there was one written to Mr.

24     Jeannite?

1      A.    Yes.

2      Q.    Do you know who wrote it?

3      A.    Yes, me.

4      Q.    It's not unusual for you to write a

5   traffic citation?

6      A.    No.  I don't write too many traffic

7   citations.

8      Q.    Why do you say that?

9      A.    I'm not a big Chapter 90.  I pull people

10  over and warn them rather than write them a

11  ticket.  I give a verbal warning.

12     Q.    But you're familiar with the procedure

13  for writing a citation?

14     A.    Yes.

15     Q.    Is there anyplace in the citation where

16  you indicate the race or ethnicity to the person

17  you're giving the citation?

18              MR. TEHAN:  I object.  This arrest

19  was in '01.  I don't know if there's a change.

20  BY MR. FISCHER:

21     A.    There is now on the uniform traffic

22  citations.  Back in 2001, I don't recall if there

23  was, but there is now on the tickets we use today.

24     Q.    Do you know what the reason the form was

1       changed to add that?

2           A.    No.

3           Q.    You haven't followed in the newspapers a

4       concern about racial profiling?

5               MR. TEHAN:  Objection.

6       BY MR. FISCHER:

7           A.    No, I haven't followed, I haven't read

8       that in the papers.

9           Q.    And you're not aware that it's an issue

10      that African Americans have complained that they

11      have been stopped, that they are stopped much more

12      frequently than Caucasians?

13          A.    Can you repeat the question?

14          Q.    You're not aware that over the past years

15      African Americans have complained that they have

16      been stopped much more frequently than Caucasians

17      have for traffic violations?

18          A.    I'm aware of African Americans, and I'm

19      aware of Hispanics saying the same thing, yes.

20          Q.    Are you aware that statistically that's

21      proven to be correct?

22              MR. TEHAN:  Objection.

23      BY MR. FISCHER:

24          A.    I don't know.

1       Q.    Are you at all concerned about that as a

2   police officer?

3                    MR. TEHAN:  Objection.

4   BY MR. FISCHER:

5       A.    Am I concerned about it?

6       Q.    Yes.

7       A.    No.  Personally I have written more

8   Caucasian people than I have African Americans.

9       Q.    How do you know that?

10      A.    I'm a 100 percent positive.  Because I

11  know people I've written citations to, and I would

12  say the majority are Caucasians.

13      Q.    That's based on your memory, not on any

14  compilation of data that you keep?

15      A.    Correct, my memory, yes.

16      Q.    What's the neighborhood that you patrol?

17      A.    At the moment I'm assigned to the desk.

18      Q.    When you were patrolling, were you

19  patrolling in predominately Caucasian or

20  predominately African American or mixed

21  neighborhoods?

22      A.    It depends on when you're talking about.

23  My most recent assignment was in the Riverside

24  area of Haverhill, which was predominantly more

1    Caucasian.

2        Q.    That's the east side?

3        A.    Yes.

4        Q.    And in 20001, what was your assignment?

5        A.    I was a detective.

6        Q.    So you were not operating a patrol car?

7        A.    Unless I was working overtime.

8        Q.    On the date of Mr. Jeannite's arrest,

9    what was your assignment?

10       A.    I believe I was assigned to a one man

11   car.

12       Q.    You were a detective then?

13       A.    Yes.

14       Q.    Were you working overtime?

15       A.    Yes, I was.

16       Q.    How frequently did you work overtime or

17   have you worked overtime in the last several

18   years?

19       A.    I try to work the minimum two, the most

20   three shifts a week.

21       Q.    And that's available to you?

22       A.    Up until recently, yes.

23       Q.    Why do you say up until recently?

24       A.    Because of the financial issues with the

1    city, they have taken away -- actually, they

2    violated part of our contract regarding what we

3    call must fill.  Now a certain amount of officers

4    can be out before -- previously they used to have

5    to hire, if someone took the day or took time off,

6    they would have to hire for that person.

7         A.    Recently they have decided at least four

8    to five people have to be off before they hire

9    someone.  So financial reasons, the city's

10   financial woes are the reason.

11        Q.    Is that also since the new chief?

12        A.    Yes.  And he's also hired numerous new

13   officers.  I shouldn't say numerous.  I would say

14   between 15 to 18 new officers.  He's filled the

15   open positions, what we call the open positions.

16   And those positions aren't available for me to get

17   overtime now.

18        Q.    So there's less overtime available

19   because the staffing has been beefed up?

20        A.    Yes.

21        Q.    That might be good economics for the city

22   but not good economics for you?

23             MR. TEHAN:  Objection.  Irrelevant.

24   BY MR. FISCHER:

1          A.    I'm still -- I'm not doing too bad.  I'll

2     still doing okay.

3          Q.    Do you still get overtime from time to

4     time?

5          A.    Again, not as much as I used to.

6          Q.    But you were working a shift in a patrol

7     car in July of 2001?

8                MR. TEHAN:  Our date is July 30.

9     BY MR. FISCHER:

10         Q.    You were working on that date?

11         A.    Yes.

12         Q.    But you were generally working as a

13    detective at that time?

14         A.    Yes.

15         Q.    And you were in a single car?

16         A.    Yes, I was.

17         Q.    Can you describe the neighborhood where

18    Mr. Jeannite was at the time on July 30?

19         A.    I was parked on Union Street, in the

20    middle of the road on Union Street next to a

21    basketball court.

22         Q.    What neighborhood is Union Street in?

23         A.    It's in what we refer to as The Acre, the

24    Lower Acre neighborhood, inner city.

1          Q.   How would you describe that neighborhood?

2          A.   In regards to?

3          Q.   Is it upscale, working class, white

4     suburban, urban, apartment buildings, single

5     family homes?

6                    MR. TEHAN:   Objection to form.

7     BY MR. FISCHER:

8          A.   It's basically numerous apartment

9     buildings.  I wouldn't call it white suburban or I

10    wouldn't call it working class.  There are people,

11    you know -- it's not a white suburban

12    neighborhood.

13         Q.   What is it then?

14         A.   A high crime area.

15         Q.   Is it the highest crime area in the city?

16         A.   Yes.

17         Q.   You're reluctant to say that?

18         A.   No.

19         Q.   So it's the highest crime area in the

20    city?

21         A.   It's a high crime area, yes.

22         Q.   And you're familiar with the

23    neighborhood?

24         A.   Yes, I am.

1      Q.   Do you recall what hours you were working

2   on July 30?

3      A.   I was working an overtime shift, 4:30 to

4   12:30 p.m.

5      Q.   And you were in uniform that day?

6      A.   Yes, I was.

7      Q.   Although your normal duties would have

8   you work nine to five in plain clothes?

9           MR. TEHAN:  I don't know if nine to

10   five was established.

11   BY MR. FISCHER:

12      A.   Eight to four, plain clothes.

13      Q.   Day shift?

14      A.   Day shift, yes.

15      Q.   Do you recall what day of the week July

16   30 was?

17      A.   No, I don't.

18      Q.   Do you recall whether it was a weekend or

19   a weekday?

20      A.   No, I don't.

21      Q.   Do you recall what drew your attention to

22   go to Union Street?

23      A.   I was dispatched to go there.

24      Q.   You personally?

1          A.    I was dispatched.

2          Q.    Would you describe the call?

3          A.    I was dispatched to go to the area of

4     Union Street on a report of a black male in a

5     black Jaguar.  He was in the neighborhood asking

6     questions.

7               The dispatcher informed me that the

8     caller informed him that the same person was in

9     the neighborhood either the day before or the day

10    before that doing the same thing, asking

11    questions, making the caller nervous.

12         Q.    Is it a crime to be a black male in a

13    Jaguar?

14               MR. TEHAN:  Objection.

15    BY MR. FISCHER:

16         A.    No it's not.

17         Q.    Is it a crime to be a black male?

18               MR. TEHAN:  Objection.

19    BY MR. FISCHER:

20         A.    No, it's not.

21         Q.    Is it a crime to be driving a Jaguar?

22         A.    No.

23         Q.    Is it a crime to be in a neighborhood?

24         A.    No.

1          Q.    Is it a crime to be asking questions?

2          A.    No.

3          Q.    So what was the reason for a police

4     dispatch?

5          A.    A citizen called and requested the police

6     come in regards to what I just told you.

7          Q.    Do you know who the citizen was?

8          A.    I don't recall at the present time.  I

9     have met her, yes.

10         Q.    Was she black?

11         A.    No, she was not.

12         Q.    Had she observed any crime or suspicious

13    activity?

14         A.    Had she?  Yes, she has.

15         Q.    I'll rephrase the question.  Did she

16    report any criminal or suspicious activity?

17         A.    She reported that there was a black male

18    in a black Jaguar in the neighborhood asking

19    questions and making her uncomfortable.  I have to

20    say this person either the day or day before was

21    doing the same thing.

22         Q.    What was criminal or suspicious about

23    that?

24                    MR. TEHAN:  Objection.  It's a

1    compound question.

2    BY MR. FISCHER:

3        Q.   What was criminal about that?

4        A.   I was requested to go to that location.

5        Q.   That's not responsive to the question.

6             MR. TEHAN:  You're arguing with him.

7    BY MR. FISCHER:

8        Q.   What was criminal about what she

9    reported, if anything?

10       A.   Nothing.

11       Q.   And was there anything suspicious about

12   what she was reporting?

13            MR. TEHAN:  To him at that time?  Are

14   you asking what is in her mind?

15            MR. FISCHER:  I'm asking what was

16   suspicious about that.

17            MR. TEHAN:  I object.

18   BY MR. FISCHER:

19       A.   To me, because I'm familiar with the

20   area, to me with the vehicles in the area, I

21   hadn't seen a black Jaguar in that area.  Knowing

22   this was a high crime area with a lot of drug

23   activity, I assumed she was calling for that same

24   reason.  And it was my assumption because it was a

1       high crime area that's why I was going there.

2           Q.   So you assumed that there may be some

3       drug involvement?

4           A.   No.  I assumed there was suspicious

5       activity in the eyes of the caller.

6           Q.   What suspicious activity did you assume?

7           A.   What the caller stated.  There was a

8       person she wasn't familiar with in the

9       neighborhood asking questions, making her

10      uncomfortable.  I went to that location to

11      investigate.

12          Q.   How long did it take you to get to the

13      location?

14          A.   I think a couple of minutes.

15          Q.   When she called, what she reported was a

16      black male in a black Jaguar who was asking

17      questions?

18          A.   That had been in the neighborhood

19      previously asking questions.

20          Q.   Do you know what questions he was asking?

21          A.   No, I do not.

22          Q.   You hadn't spoken to the woman that

23      called?

24          A.   No, I had not.

1          Q.    And you hadn't spoken to anyone he had

2     spoken to?

3                    MR. TEHAN:  Who is the he?

4                    MR. FISCHER:  The black male in the

5     Jaguar.

6     BY MR. FISCHER:

7          A.    No I had not.

8          Q.    And you weren't aware he was involved in

9     any drug dealings?

10         A.    I had no knowledge.  I hadn't gotten

11    there yet.  I went to investigate.

12         Q.    And you had no reason to suspect that he

13    was involved in any drug dealings or drug

14    activities?

15                    MR. TEHAN:  Objection.

16    BY MR. FISCHER:

17         A.    I had no reason.  I hadn't gotten there

18    yet.

19         Q.    But you said you were investigating

20    because it was an area that was a high crime, high

21    drug dealing area?

22         A.    Yes.  I had made numerous arrests in this

23    area.  I had seen numerous violent activity in

24    this area with fights.  I've seen numerous drug

1    transactions in this area.  I've seen police

2    officers stabbed in this area.  I've seen police

3    officers assaulted with bricks in this area.

4         Q.   But this black male you had no knowledge

5    or information that he was violent or assaultive?

6         A.   I was just responding to a call I was

7    dispatched to.

8         Q.   Let's make the record clear.  You had no

9    reason to believe he was violent or assaultive or

10   engaged in violent behavior?

11        A.   No.

12        Q.   You had no reason or evidence to suspect

13   that he was involved in drug dealing?

14        A.   I hadn't gotten there yet, sir.  I had no

15   knowledge until I got there to investigate.

16        Q.   I'm trying to back up and find the reason

17   you were going there to investigate.

18        A.   Because I was dispatched.

19        Q.   The only reason you were going to

20   investigate was because you were dispatched?

21        A.   Yes.

22        Q.   So there was no suspicion of a crime

23   being committed that you were aware of?

24        A.   Not at that point.  I was dispatched to

1    go and investigate a black male in a black Jaguar

2    in the area.

3         Q.    Let's be clear.  So at the time you were

4    being dispatched, you had no reason to suspect

5    that a crime was being committed?

6                   MR. TEHAN:  Objection.

7    BY MR. FISCHER:

8         A.    I was being dispatched to investigate.

9         Q.    And at the time that you were being

10   dispatched, you had no reason to suspect that a

11   crime was being committed?

12                  MR. TEHAN:  Objection.  Asked and

13   answered one moment ago.

14                  MR. FISCHER:  It was asked.  It

15   hasn't been answered.

16                  MR. TEHAN:  It was.  Give it to him

17   again.

18   BY MR. FISCHER:

19        A.    I was dispatched to go to that location

20   to investigate a black male in a black Jaguar.  A

21   female caller, the dispatcher informed me the

22   caller stated he was in the area earlier, either

23   the day before or the day before that, and he was

24   making her nervous.

```
 1          Q.   I'm going to ask the question again and
 2     suggest the question calls for a yes or no answer.
 3                    MR. TEHAN:  You won't suggest that.
 4     He'll answer as an appropriate response.  You're
 5     not here to suggest how he answers.
 6                    MR. FISCHER:  The question calls for
 7     a yes or no answer.
 8                    MR. TEHAN:  He'll answer as he sees
 9     fit.  You're not his lawyer.  You don't advise him
10     how to answer a question.  Just ask the question.
11     BY MR. FISCHER:
12          Q.   At the time that you were dispatched, you
13     were not aware or provided any information that
14     gave rise to suspect the crime was committed;
15     isn't that true?
16                    MR. TEHAN:  Objection.
17     BY MR. FISCHER:
18          A.   I was not given any information by the
19     dispatcher that a crime occurred, only that there
20     was a citizen that made a complaint about a
21     particular person acting suspicious, and that's
22     why I was sent to investigate.
23          Q.   And what was the suspicious activity?
24                    MR. TEHAN:  Objection.  Asked and
```

1    answered about five times now.  Give it to him

2    again.

3    BY MR. FISCHER:

4        A.   The fact that the caller didn't recognize

5    this person.  He was in the neighborhood asking

6    questions, and he had been there the day before or

7    the day before that asking questions.

8        Q.   And when you got there, you got there

9    within a couple of minutes?

10       A.   Yes.

11       Q.   Were you the first police officer there?

12       A.   No, I was not.

13       Q.   Who was there when you got there?

14       A.   There was a two man car operated by,

15   occupied by at the time Officer Doherty, now

16   Sergeant Doherty, and Officer Glenn Fogarty.

17       Q.   And they were in the car when you got

18   there?

19       A.   No, they were not.

20       Q.   Could you sketch out the area of Union

21   Street.  Place the black Jaguar, the two man

22   cruiser and where officers Doherty and Fogarty

23   were at the time you arrived?

24               MR. TEHAN:  I object.  He's not an

1    artist and this is not to scale.  With that you

2    can proceed.

3    BY MR. FISCHER:

4        Q.   We won't grade you.  We'll mark it as

5    Exhibit 1.

6                    (Document marked for identification

7    as Exhibit No. 1.)

8    BY MR. FISCHER:

9        Q.   Union Street --

10       A.   It's referred to as the Union Street

11   Park.  Some people refer to it as McMurrer Park.

12       Q.   Then you drew Union Street here?

13       A.   This is Union Street here.

14       Q.   And you said there are apartment

15   buildings?

16       A.   Yes.

17       Q.   Put in where they are.  And put the

18   numbers.

19       A.   I know that's No. 1.  I don't know if

20   this is referred to as 3-5 or 5.  I know there's

21   several apartment buildings.

22       Q.   When you say apartment buildings, do you

23   mean triple deckers or elevator buildings?

24       A.   I believe one of these two houses may be

1    a single family home.  I'm not sure which one.

2    The rest are triple deckers to the best of my

3    recollection.

4         Q.   And do you know the woman who called,

5    where she lived?

6         A.   I don't recall the number.  I want to say

7    either 13 or 17.

8         Q.   Write the word caller about where she

9    would be.

10        A.   (Witness complies.)

11        Q.   Now, you didn't see her anywhere when you

12   came?

13        A.   No, I did not.

14        Q.   And you put a D here?

15        A.   That's correct.

16        Q.   Would that be --

17        A.   That's for Doherty and F is for Fogarty

18   an J is for Jeannite.

19        Q.   The second car would be?

20        A.   The cruiser that officers Doherty and

21   Fogarty were in and me behind them.

22        Q.   There's a D inside because you were

23   inside the car?

24        A.   Correct.

57

1      Q.   And there are two marks on either side of

2   the first cruiser?

3      A.   I had put that down originally because I

4   wanted to let you know that was their car.  When I

5   pulled up, they were already outside their car.

6   They were at the windows of Mr. Jeannite's car.

7      Q.   Were there other people there?

8      A.   Yes.  There were numerous people playing

9   basketball and people all milling around the area

10  here, which is not uncommon.

11     Q.   Because it's an urban populated area and

12  the park is populated?

13     A.   Yes, a lot of young children and

14  teenagers playing basketball.

15     Q.   And that is what was going on when you

16  came?

17     A.   What was going on?

18     Q.   Teenagers playing basketball and young

19  children in the park?

20     A.   Yes, as well as -- I had driven through

21  that area several times throughout the night and I

22  noticed several people that stood out to me that

23  I've had dealings with before, criminal dealings.

24     Q.   These are people in the park?

1        A.    In the park, walking in the area, yes.

2        Q.    What time was it when you responded to

3   the dispatch?

4        A.    I believe I got the call at approximately

5   20:05 hours, which would be 8:05 p.m., and I

6   responded within a couple of minutes.

7        Q.    So you were there a few minutes after 8

8   o'clock?

9        A.    I'd say a few minutes -- again, I got the

10  call at 8:05 p.m. and I got there within a couple

11  of minutes.  Between 8:05 and 8:10.

12       Q.    Was it still light out?

13       A.    To the best of my recollection, yes.

14       Q.    And tell us what you observed when you

15  got there.

16       A.    When I pulled up, I pulled up behind the

17  police vehicle that Doherty and Fogarty were in.

18  They had already had a vehicle stopped.  I noticed

19  that it was a black Jaguar.  It was parked in the

20  middle of the street.

21            And I noticed that Officer Doherty was to

22  the left, the driver's side, and Officer Fogarty

23  was to the right side of the vehicle.

24       Q.    Did you hear anyone saying anything?

1          A.    I heard Officer Doherty ask the driver,

2     who I had not even observed yet, for his driving

3     information, driver's license and information.

4          Q.    And what was the basis for doing that?

5                MR. TEHAN:   Objection.   You're asking

6     him to speculate.

7     BY MR. FISCHER:

8          Q.    Were you aware of any basis for stopping

9     the vehicle or the driver at that time?

10         A.    As I was approaching, as I was responding

11    to the area, I heard those officers say they have

12    a vehicle, a black Jaguar pulled over.

13         Q.    And were you aware what the basis for the

14    stop was?

15         A.    No, I wasn't.

16         Q.    And did you observe any reason or basis

17    for stopping the vehicle?

18         A.    It was already stopped when I got there.

19         Q.    And you didn't observe any anything that

20    could have been the reason or basis for the stop?

21                MR. TEHAN:   Objection.

22    BY MR. FISCHER:

23         A.    It was already stopped when I got there.

24    I observed -- I didn't observe the stop.

60

```
 1        Q.    There wasn't an accident --
 2        A.    I didn't know yet.   When I arrived, the
 3   vehicle was stopped, and I observed Doherty and
 4   Fogarty on each side of the vehicle.
 5        Q.    And after you arrived, did you observe
 6   anything that was a reason or basis for the stop?
 7                   MR. TEHAN:   Objection.
 8   BY MR. FISCHER:
 9        A.    I didn't observe the vehicle stop, sir.
10   I observed Officer Doherty asking an operator of
11   the vehicle for his license and registration
12   information.
13        Q.    Maybe I'm not asking the question
14   clearly.   Sometimes after a stop it's evident what
15   the stop is for and sometimes it's not.   If there
16   was damage to the front of the vehicle and damage
17   to some stationary object, you could presume that
18   the vehicle had hit something, the driver hit
19   something, and you would say that's why he was
20   stopped.
21             The question is, although you didn't
22   observe any operation, you didn't observe the
23   stop, was there anything you observed that might
24   have been a clue to you as to what the reason for
```

1    the stop was?

2                    MR. TEHAN:  Objection to form.

3    BY MR. FISCHER:

4        A.    I made one observation.  I observed the

5    trunk lock was missing on the trunk of the vehicle

6    as I was approaching.  That could be a reason for

7    a stop.

8        Q.    Why would that be a reason for a stop?

9        A.    Again, I didn't stop -- that's one reason

10   of suspicious activity.  In my experience, door

11   locks that are popped tend to be stolen vehicles.

12       Q.    Had anyone done a license check on this

13   vehicle?

14                    MR. TEHAN:  At what point?

15   BY MR. FISCHER:

16       Q.    Prior to the stop?

17       A.    I don't know.  I didn't.

18       Q.    Do you know if anyone ever did a license

19   check on this vehicle?

20       A.    What do you mean, registration check or

21   license check?

22       Q.    Registration check.

23       A.    I don't recall.  Eventually there was a

24   registration.  When, I don't recall.

1        Q.    Do you know if the vehicle belonged to

2    the operator?

3        A.    Subsequently I learned it belonged to the

4    operator.

5        Q.    At the time the operator was stopped, was

6    there any reason to believe the vehicle was

7    stolen?

8                    MR. TEHAN:   I'll object.   He wasn't

9    there then.

10   BY MR. FISCHER:

11       A.    I wasn't there then.

12       Q.    Are you aware of any reason?

13       A.    I became aware once I approached Officer

14   Doherty.

15       Q.    And what did you become aware of?

16       A.    That there was another black male leaning

17   in the window, which led them to believe that

18   there may be drug activity through their

19   experience.

20       Q.    Did you observe the other black male?

21       A.    I did not.

22       Q.    Did you see any other black male?

23       A.    I did not.

24       Q.    So Officer Doherty told you, what did he

1        tell you about this other black male?

2            A.    Again, as I approached, I heard Officer

3        Doherty request the operator's license information

4        and registration information.  I observed the

5        popped lock on the trunk.

6                 And officer, I believe it was Officer

7        Fogarty who leaned over the roof of the car and

8        said as they were pulling up they observed some

9        suspicious activity, a man leaning in the vehicle

10       of the vehicle they stopped.

11                And as they were approaching, the person

12       outside the vehicle ran off, and they subsequently

13       stopped the vehicle.

14           Q.    Do you know if a chase was given to the

15       suspicious male leaning in the vehicle?

16           A.    I didn't observe any chase.  I didn't

17       observe it.  They were --

18           Q.    They told you that there was a suspicious

19       man?

20           A.    And that he ran off.

21           Q.    And was that a suspicious act?

22           A.    Would I find that suspicious in that

23       area, yes, very suspicious.

24           Q.    And did they tell you that they gave

1       chase to this man who had ran off suspiciously?

2           A.    No, they didn't tell me they gave chase.

3           Q.    Did they tell you that they didn't give

4       chase or --

5           A.    They didn't tell me anything.

6           Q.    But they told you they had stopped the

7       vehicle because of the suspicious man who was at

8       the side and had ran away?

9           A.    And the dispatch regarding the black male

10      in the black Jaguar which was in the area of where

11      I was being dispatched to.

12          Q.    Did they tell you anything else at that

13      time?

14          A.    Just that the gentleman wasn't

15      cooperating, he was not turning over his

16      information that they requested.

17          Q.    And did you observe the gentleman?

18          A.    Yes, I did.

19          Q.    Tell us what you observed.

20          A.    Again, as I was approaching the vehicle,

21      I observed a Norwich University sticker.  I

22      attended Norwich University.  When the officers

23      again asked the gentleman for his license and

24      registration, he was yelling and argumentative

1      stating we had no reason to stop him, why were we

2      stopping him.

3              I attempted to calm the operator down by

4      bringing up the fact that I, I asked him if he

5      attended Norwich University.  He stated he did.  I

6      said, "Well, I went to Norwich University too,"

7      hoping this would settle him down, calm him down,

8      because of the way he was acting.

9      Q.    You had observed that there was a Norwich

10     University sticker on the back of the car?

11     A.    Yes.

12     Q.    And now you ask him if he attended

13     Norwich university, I did too?

14     A.    Yes.

15     Q.    And he said I attend there?

16     A.    I believe he said he didn't care if I

17     attended there.

18     Q.    Did he indicate that he attended there?

19     A.    I don't recall.  I don't recall if he

20     said he did or didn't.

21     Q.    So you're saying he was unresponsive to

22     the question as us lawyers say?

23     A.    Yes.  He was concerned about why he was

24     being stopped.

1    Q.   And were you able to answer that question

2    for him?

3    A.   I informed him we were investigating a

4    report of a black male in the neighborhood asking

5    questions.

6    Q.   And he was indignant about that?

7    A.   Can you rephrase that?

8    Q.   He was not happy with that response?

9    A.   He was not happy from the point I walked

10   up to the vehicle.

11   Q.   Is it fair to say you were telling him he

12   was the subject of an investigation?

13   A.   It's fair to say that it was explained to

14   him why he was being stopped.

15   Q.   What was explained to him is that he was

16   a black male in a black Jaguar and that was a

17   reason to investigate him.  Is that what was

18   explained to him?

19   A.   That's what I explained to him.

20   Q.   *And is it a crime to be a black male in

21   a Jaguar?

22              MR. TEHAN:  Objection.  Argumentive

23   and asked and answered.

24              MR. FISCHER:  Well, it's not

1    argumentative because that's what is being offered

2    as the reason for the stop.  And when I try to

3    find out if there's anything else that was the

4    reason for the stop, you tell me I've already

5    asked the question and it's been answered, but it

6    hasn't been answered.  And that's why there's a

7    case for false arrest here.

8                    MR. TEHAN:  Maybe you should lower

9    your voice.  You have asked the same questions

10   over and over again.  Obviously being a black male

11   in a black Jaguar is not a crime.  You are

12   harassing this witness and you've don't it twice

13   now.  Move on.

14                    (*Court reporter reads back noted

15   question as recorded.)

16   BY MR. FISCHER:

17       A.    No.

18       Q.    Was there any other reason being offered

19   to him why he was being stopped?

20                    MR. TEHAN:  Objection.

21   BY MR. FISCHER:

22       A.    I believe one of the officers was asking

23   why there was someone hanging inside his vehicle.

24       Q.    Why there was what?

1       A.    A gentleman leaning in his vehicle.  But

2    I didn't observe that and I didn't ask the

3    questions.

4       Q.    Did you have any other conversation after

5    you asked him about attending Norwich University?

6       A.    No, I just asked him to calm down.

7       Q.    And who else spoke after that?

8       A.    After what, sir?

9       Q.    After you told him to calm down, that you

10   went to Norwich University also?

11      A.    And that he was stopped and by law he has

12   to produce a license or his license information on

13   request of a police officer.  And he refused to do

14   so.  I believe he stated he had a license but he

15   didn't have it on him.

16           I recall informing him that we still need

17   your information to do a license check, and he

18   still refused to give his name and information.

19      Q.    Was anyone raising their voices at this

20   time?

21      A.    Mr. Jeannite.

22      Q.    Was anyone else raising their voices?

23      A.    No.

24      Q.    Were you at the trial in this case?

1      A.    Yes, I was.

2      Q.    Do you recall any civilian witnesses

3  testifying?

4      A.    I recall a few, yes.

5      Q.    Do you recall a Hispanic woman testifying

6  that police officers were raising their voices at

7  Mr. Jeannite and shouting at him?

8      A.    I don't recall that.

9      Q.    But your testimony would be that wasn't

10  true?

11      A.    My testimony -- we may have been talking

12  loud so Mr. Jeannite would hear us over his

13  yelling.  I wouldn't say we were yelling.  Again,

14  he was asked several times to produce his license

15  and registration information.

16      Q.    Did he ultimately produce any

17  identification?

18      A.    No, he did not.

19      Q.    So what happened next?

20      A.    At this point I was making the

21  observations of people in the basketball courts

22  that were playing.  They were gathering along the

23  side of the road here where we were standing.  I

24  noticed several people on their porches and people

70

1        looking out their windows.

2              I observed people coming up from the

3        Nichols Street area.  Due to my experience in this

4        neighborhood, I've seen officers assaulted when

5        there's confrontations and I asked Mr. Jeannite

6        one last time, "Can I have your license and

7        registration?"

8              He told me in his own words, "Go fuck

9        yourself."  At this point I asked Mr. Jeannite to

10       step out of his vehicle, which he did without

11       incident.  I informed him he was being placed

12       under arrest for disorderly conduct and for

13       failure to produce the license and registration on

14       request.

15          Q.   And you say he was cooperative when he

16       got out of the car?

17          A.   Yes.

18          Q.   And the only thing he did once you told

19       him to get out of the car was that he got out of

20       the car?

21          A.   Yes, he did.

22          Q.   And allowed you to cuff him and put him

23       in the police cruiser?

24          A.   Yes, he did.

1     Q.   Was it you that cuffed him and put him in

2  the cruiser?

3     A.   Yes.

4     Q.   Did you put him in your cruiser?

5     A.   No, I did not.

6     Q.   You put him in the other cruiser?

7     A.   Yes.  It's procedure that someone under

8  arrest either be transported by a two man car or

9  two one man cars with someone following.  I placed

10  him in the rear of Officer Fogarty and Officer

11  Doherty's car and instructed them to transport him

12  to the station.

13          And then due to where the vehicle was

14  parked, it was blocking the middle of the road, I

15  requested a tow truck and the vehicle was going to

16  be towed.  And I stood by and did an inventory on

17  the vehicle until the tow truck arrived.

18          And at which point the tow truck arrived

19  and the vehicle was towed and then I went to the

20  police station where Mr. Jeannite was transported

21  to already by those two officers.

22     Q.   Is this the inventory that you did?

23     A.   Yes, it is.

24          MR. FISCHER:  We'll mark it as

1               C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    PLYMOUTH, SS.

4           I, Patricia M. Haynes, a Notary Public in

5    and for the Commonwealth of Massachusetts, do

6    hereby certify:

7           That GEORGE DEKEON, JR., the witness

8    whose testimony is hereinbefore set forth, was

9    duly sworn by me and that such testimony is a true

10   and accurate record of my stenotype notes taken in

11   the foregoing matter, to the best of my knowledge,

12   skill and ability.

13          IN WITNESS WHEREOF, I have hereunto set

14   my hand and Notarial Seal this 15th day of July

15   2005.

16

17          _____
                 Patricia M. Haynes, CSR
18                   Notary Public

19

20   My commission expires July 30, 2010

21

22

23

24