UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
*******************************************
JOEL JEANNITE,                             *
                                           *
            Plaintiff                      *
                                           *
v.                                         *
                                           *  C.A. NO. 04-CV-10541-RWZ
CITY OF HAVERHILL, STEPHEN BRIGHI, in      *
his capacity as CHIEF OF THE HAVERHILL     *
POLICE DEPARTMENT, STEPHEN DOHERTY,*
GEORGE DEKEON, JR., JOHN DOE and JOHN      *
ROE,                                       *
            Defendants                     *
*******************************************
```

## STATEMENT OF CONTESTED FACTS

### I. Introduction and Brief Statement of Facts

This case involves the July 30, 2001 arrest of plaintiff Joel Jeannite by three defendant city of Haverhill police officers. Plaintiff Jeannite was stopped when officers were summoned by dispatch based upon a call from a citizen about a "suspicious person". This fact is not disputed.

The defendant officers arrested the plaintiff after a Terry stop. Upon demand of the defendant officers, the African-American plaintiff produced identification, in the form of a Norwich College photo id. It had a photograph of the plaintiff with his white girlfriend on the back. The defendant officers took offense at this and the result was the plaintiff's arrest.

Defendants have attempted to insert "facts" suggesting that the area was a "high Crime" area, but this was irrelevant to the stop of the plaintiff, as the defendants had no evidence that the defendant had or was about to commit any crime when they stopped him. The defendants also include facts that imply that the plaintiff's arrest arose from a motor vehicle stop. The stop of

the plaintiff, justifiable as a Terry investigative stop if at all justifiable, was in response to a citizen call reporting suspicious behavior. It did not involve operation of a motor vehicle or a motor vehicle or even any observation of criminal activity.

Accordingly, plaintiff, in addition to this response to the defendants' claimed "undisputed" facts, also has submitted, separately, his own statement of relevant facts which excludes the many irrelevant and disputed "facts" listed by the defendants.

## II. <u>Omitted Relevant Facts</u>

1. Plaintiff Jeannite produced a Norwich College photo identification card ("ID") in response to the defendants' request that he identify himself. [Jeannite deposition, p.69, Exhibit B]  He also produced a valid registration for the car in which he was seated.

2. Upon seeing the picture of Jeannite with a white girl on the back of Jeannite's ID, one of the officers present exclaimed "What's a good looking white chick dating a black kid like that?" [Jeannite deposition, p.73, Exhibit B]

3. The defendants ran Jeannite's name and registration and discovered that Jeannite was a duly licensed driver and that the Jaguar he was driving was properly registered to him. [Jeannite deposition, p. 74, Exhibit B]

4. One of the defendants began yelling at Jeannite and told him to, "Get the fuck out of the car." [Jeannite deposition, p. 84, Exhibit B].

5. The defendants abused their discretion by arresting plaintiff Jeannite for disorderly conduct in response to the photo that showed the African-American plaintiff with a white girl after he had properly identified himself.

6. The defendants had no probable cause to arrest the plaintiff at the time they arrested him.

7. After the arrest, which was motivated by racial discrimination, the defendants determined that the plaintiff did not have his drivers license with him, and used this and a fabricated charge of "disorderly conduct" to cover up their racially motivated arrest.

### III. Contested Facts

1. On July 30, 2001, City of Haverhill Police Officers Stephen Doherty ("Doherty") and Glen Fogarty ("Fogarty") were on patrol in a police cruiser in the City. Officer George Dekeon was patrolling in a separate cruiser by himself. Excerpts of Deposition of Stephen Doherty ("Exhibit A"), p. 65, 1.7-10; Excerpts of Deposition of George Dekeon ("Exhibit C"), p. 43, 1.6-16.

**Plaintiff does not contest this fact**

2. At approximately 8 p.m., the police dispatcher sent a transmission, advising of a 911 call from a resident of 11 Union Street who reported suspicious activity. Specifically, the Union Street resident had reported that a black male in a black Jaguar whom she did not know came to her house and asked her questions. Exhibit A, p. 65, 1.12-19; Exhibit B, p. 26, 1.13-16, Exhibit C, p.46, 1.3-6; p. 58, 14-5. The dispatcher making the transmission used the term "suspicious activity." Exhibit A, p. 117, 1.19-23.

**Plaintiff seeks to strike all the contents of the radio call, such as the report of "suspicious activity" as inadmissible hearsay and thus not properly before the Court under F.R.C.P., Rule 56(e), which requires that facts presented in support of summary judgment be "such facts as would be admissible in evidence".**

**What the dispatcher told the defendant officer that the unknown 911 caller said is totem pole hearsay and not properly admissible. Thus there is no evidence of "suspicious activity", and the only admissible portion of ¶ 2 is that the defendants went to Union Street in response to a call to the dispatcher, as the substance of the call is inadmissible hearsay.**

In fact, the defendants had no evidence of any suspicious activity. The undisputed fact is that the plaintiff was merely looking for the home of someone he had met. When the police encountered him, he was sitting in his car on the side of the road speaking on his cell phone. [Jeannite deposition, 53-66 Exhibit B]

There is no admissible evidence either that the plaintiff was involved in "suspicious activity" or that the radio dispatch so reported, only defendants' hearsay testimony of what the dispatch said. Indeed, the defendants have failed to provide a copy of the dispatch tape, even though they were bound to do so under Rule 26 Automatic Disclosure and in response to the plaintiff's requests for documents. The defendants' failure to produce evidence which they now contend supports a fact they raise in their defense should entitle the plaintiff to an adverse inference that the dispatch tape did not report "suspicious activity." [F.R.C.P., Rule 37 (b) (2)]

3. The transmission also reported that, the previous day, a Union Street resident had called the police station, reporting identical activity. Exhibit A, p. 65, 1.18-19; Exhibit B, p. 27 1.12-16; Exhibit C, p. 46, 1.7-11.

**Again, the plaintiff disputes the content of the dispatch tape, for the reasons stated above.**

4. Union Street is located in an area know as "Acre Neighborhood." Acre Neighborhood was known to Officers Dekeon, Doherty and Fogarty as an "explosive" area, with the City's highest rate of crime. There is considerable drug activity in the area, as well as numerous incidents of violence, including shootings. In 1996, a state trooper was stabbed there; and in the two years prior to the incident underlying this Complaint, two major disturbances had broken out during arrests. Exhibit A, p. 44, 1.9-20; p. 91, 1.8-9; p.118, 1.23-p119, 1.11; p.125, 1.15-24; Exhibit B, p.24, 1.2-10; Exhibit C, p.50, 1.20-p.51, 1.3.

**Plaintiff does not dispute that Union Street is located in Acre Neighborhood. Plaintiff takes no position on the truth or falsity of the defendants' claims as to the characteristics of Acre Neighborhood other than to assert that these claims are irrelevant. Massachusetts case law is clear that mere presence in a high crime area does not justify a threshold inquiry.** <u>*Com. v. Cheek*</u>**, 413 Mass. 492 (1992)**

5. Dekeon was advised by the dispatcher to respond to the 911 call from Union Street. <u>Exhibit C</u>, p.45, 1.21-23. Doherty and Fogarty responded to the dispatch as well, because they were in the immediate area. <u>Exhibit A</u>, p.68, 1.2-6; <u>Exhibit B</u>, p.31, 1.19-22.

**Plaintiff does not dispute this fact.**

6. Doherty and Fogarty were the first to arrive at the scene of the 911 call. <u>Exhibit A</u>, p.71, 1.16-17.

**Plaintiff does not dispute this fact.**

7. When Doherty and Fogarty arrived, they observed a black Jaguar with its trunk lock missing. <u>Exhibit A</u>, p.71, 1.5-7; 1.10-11; p.72, 1.20-2; <u>Exhibit B</u>, p.32, 1.5-8.

**Plaintiff does not dispute that Doherty and Fogarty observed the black Jaguar when they arrived. Nor does plaintiff contest that defendants at some point noted that the trunk lock was missing. However, the evidence is not clear <u>when</u> this was noted, and the juxtaposition of these facts by the defendants suggests that the defendants immediately observed the missing trunk lock upon arriving at the scene, giving them some reason to "suspect" the plaintiff of something. This is misleading.**

**There is no evidence when the defendants noticed that the trunk lock was missing and viewing the facts in the light most favorable to the plaintiff, as the defendants are obliged to do, the defendants must concede that they did not observe the missing trunk lock**

until after they had arrested the plaintiff or did not occur until after the officers had already ascertained that the car was not stolen. [Jeannite deposition, p.81 Exhibit B].

8. Based on the officers' experience, the missing trunk lock was an indication that the vehicle was stolen. Exhibit A, p. 81, 1.3-8; Exhibit C, p. 61, 1.10-11.

**This conclusion should be stricken as it is based upon placing events out of sequence [see ¶ 7, above], again failing to accept the facts in the light most favorable to the plaintiff and thereby improperly coloring the facts to justify the stop.**

9. Doherty and Fogarty ordered the driver of the Jaguar, plaintiff Joel Jeannite, to stop and put his hands out of the car; Jeannite complied with the order. Exhibit A, p.75, 1.2-6; Exhibit B, p.33, 1.1-3.

**While technically true, this statement is misleading as it characterized the encounter as a motor vehicle stop. The facts taken in the light most favorable to the plaintiff indicate that this was a Terry stop, in response to a call about a "suspicious person," or as defendant Dekeon put it, "a black man in black jaguar." [Dekeon deposition 45-52, Exhibit C] The fact that Jeannite was in his car when the defendants came upon him in response to the call about a "suspicious person" is irrelevant and its inclusion improperly colors the facts to the advantage of the defendants.**

10. Doherty approached the care and twice asked Jeannite to produce a driver's license and motor vehicle registration. Exhibit A, p.80, 1.10-15; Exhibit B, p.35, 1.8-11; Excerpts of Deposition of Joel Jeannite ("Exhibit D"), p.68, 1.13-18.

**While technically true, this statement is misleading as it characterized the encounter as a motor vehicle stop. The facts taken in the light most favorable to the plaintiff indicate that this was a Terry stop, in response to a call about a "suspicious person," or as**

**defendant Dekeon put it, "a black man in black jaguar." [Dekeon deposition 45-52, Exhibit C] The fact is that defendant Dekeon had no right to ask for a drivers license, as the defendants' justification for the stop was a Terry investigation. The defendants have never claimed this was a motor vehicle stop and thus had no basis to ask for a drivers license.**

11. Jeannite failed to produce a driver's license or motor vehicle registration. <u>Exhibit A</u>, p.84, 1.6-8; <u>Exhibit B</u>, p. 35, 1.11-13; <u>Exhibit D</u>, p.69, 1.2-3.

**First, this "fact" is not true. The undisputed evidence is that plaintif Jeannite did produce valid identification and registration of the vehicle.**

**Moreover, while it is true that Jeannite failed to produce a driver's license, this is irrelevant and misleading, as he had no obligation to produce a drivers license in response to a Terry stop.**

**The defendants again fail to cast the facts in the light most favorable to the plaintiff, instead attempting to cast this as a traffic stop, rather than a "<u>Terry</u>" stop, [defined in <u>Terry v Ohio</u> as one in which officers are permitted to stop a citizen based on a "reasonable, articulable suspicion" and inquire as to identity.   <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868.]**

**Defendants gloss over the fact that they had no "reasonable, articulable suspicion" to stop the plaintiff and omit the fact that Jeannite identified himself by providing a valid photo identification, his college ID.  [Jeannite deposition, p.69-70, Exhibit B].  It was the presence of the picture of Jeannite with his white girl friend on the back of the card that caused the officers to become upset and was the basis for the arrest followed [Jeannite deposition, p.70, Exhibit B], a fact the defendants fail to disclose.**

**Not only did Jeannite produce a valid motor vehicle registration, but the officer used it in conjunction with his Norwich College ID to confirm his identity, that he was duly licensed, and that the car was properly registered to him. [Jeannite deposition, p.74-75, Exhibit B]**

12. Dekeon arrived on the scene while Doherty was attempting to obtain Jeannite's license and registration. Exhibit A, p.84, 1.15-16; Exhibit B, p.37, 1.10-12.

**Plaintiff does not dispute this fact.**

13. Upon arrival, Dekeon observed the Jaguar with its trunk lock missing, and heard Doherty request Jeannite's license and registration. Exhibit C, p.59, 1.1-3; p.61, 1.4-6.

**Plaintiff does not dispute this fact, only when it occurred. Viewing the evidence in the light most favorable to the plaintiff, the defendants did not note that the trunk lock was missing until after they had arrested the plaintiff and had verified the plaintiff's proper ownership of the car.**

14. Dekeon then asked Jeannite to produce a license and registration which Jeannite did not do. Exhibit C, p.70, 1.5-7.

**First, this "fact" is not true. The undisputed evidence, as noted in response to ¶11, above, is that plaintiff Jeannite did produce valid identification and registration of the vehicle.**

**Moreover, while it is true that Jeannite failed to produce a driver's license, this is irrelevant and misleading, as he had no obligation to produce a drivers license in response to a Terry stop.**

**The defendants again fail to cast the facts in the light most favorable to the plaintiff, instead attempting to cast this as a traffic stop, rather than a "_Terry_" stop, [defined in _Terry_**

*v Ohio* as one in which officers are permitted to stop a citizen based on a "reasonable, articulable suspicion" and inquire as to identity. <u>Terry v. Ohio,</u> 392 U.S. 1, 88 S.Ct. 1868.]

**Defendants gloss over the fact that they had no "reasonable, articulable suspicion" to stop the plaintiff and omit the fact that Jeannite identified himself by providing a valid photo identification, his college ID. [Jeannite deposition, p.69-70, Exhibit B]. It was the presence of the picture of Jeannite with his white girl friend on the back of the card that caused the officers to become upset and was the basis for the arrest followed [Jeannite deposition, p.70, Exhibit B], a fact the defendants fail to disclose.**

**Not only did Jeannite produce a valid motor vehicle registration, but the officer used it in conjunction with his Norwich College ID to confirm his identity, that he was duly licensed, and that the car was properly registered to him. [Jeannite deposition, p.74-75, Exhibit B]**

15. Dekeon placed Jeannite under arrest for failure to produce a license and registration pursuant to G.L. c 90 § 25 and disorderly conduct pursuant to G.L. c. 272 § 53. <u>Exhibit C</u>, p. 70, 1.9-14.

**While this technically true, it places together in time two facts that, when viewed in the light most favorable to the plaintiff, cannot be viewed as happening simultaneously.**

**It is true that the defendants arrested plaintiff Jeannite. It is also true that they eventually charged the plaintiff with disorderly conduct and failure to produce a drivers license. But it does not view the facts presented in the light most favorable to the plaintiff to suggest that the defendants arrested Mr. Jeannite for disorderly conduct and failure to produce a drivers license, when there is evidence that what precipitated Jeannite's arrest**

was the photo of the African-American plaintiff with a white girl on the back of his college identification card. [Jeannite deposition, 73-80, Exhibit B]

Moreover, G.L. c. 90 § 25 is a statue that is applicable to motor vehicle stops, not Terry stops. The defendants never suggest that this was a motor vehicle stop.

16. Dekeon alone effected the arrest of Jeannite, applying handcuffs to him and placing him in a police cruiser. Exhibit A, p.120, 1.23-p.121, 1.15; Exhibit B, p.60, 1.5-8; Exhibit C, p.70, 1.9-14; p.71, 1.1-3.

This fact is subject to dispute, as it is disputed when the "arrest" occurred. The arrest occurs, as a matter of law, when the plaintiff submits to the Officers' show of authority, CA v. Hodari D., 499 U.S. 621, 627-28 (1991), not later, when Dekeon formally stated "You are under arrest" and handcuffed the plaintiff. The point where the plaintiff submitted to the Officers' show of authority, viewing the facts most favorably to the plaintiff, was when the first two defendants, Fogarty and Doherty, arrived and told the plaintiff to "Get out of the car and keep your hands off the car", as they stood on either side of him.

17. Other than Dekeon's placement of handcuffs, no officer engaged in any physical contact with Jeannite. Exhibit D, p.107, 1.17-20. Jeannite sustained no physical injury as a result of his arrest. Id., p.42, 1.20-23.

Plaintiff does not dispute this fact.

18. No officer threatened Jeannite in any way during the arrest. Exhibit D, p.107, l.14-16.

Plaintiff questions what the defendants mean by "threaten" and why they include this seemingly irrelevant fact.

19. Jeannite, who is African-American, testified that no police officer said anything directly to him that he perceived as racist or derogatory based on his race. Exhibit D, p.86, l.4-7.

**Plaintiff disputes this as ignoring the single true cause for his arrest: the photograph of the African-American plaintiff with his white girl-friend, a fact that the defendants ignore.**

**The evidence is that, upon viewing the photograph of the plaintiff and his white girl-friend, the defendants reacted by exclaiming , "What's a good looking white chick dating a black kid like that?" [Jeannite deposition, p.73, Exhibit B] and then arresting the plaintiff, apparently for the crime of dating a white girl.**

**Defendants also omit the fact that one of the officers began yelling at Jeannite and told him to, "Get the fuck out of the car." [Jeannite deposition, p. 84, Exhibit B].**

20. Following the arrest, Dekeon performed an inventory search of Jeannite's vehicle. Exhibit C, p.81, l.4-6.

**Plaintiff does not dispute this fact, but suggests that it is irrelevant.**

21. The policies and procedures of the Haverhill Police Department provide that whenever a vehicle is to be towed or impounded, "an inventory of that vehicle must be performed by either the investigating officer or his superior officer." The policies and procedures also prescribe the methods for conducting such an inventory, which include "[a]n examination of … the interior of the trunk." City of Haverhill Motor Vehicle Inventory Policy ("Exhibit E").

**Plaintiff does not dispute this fact but suggests that it is irrelevant.**

22. Following Jeannite's arrest, Dekeon applied for a criminal complaint against him on charges of failure to produce a license and registration, and disorderly conduct. Docket for Criminal Case No. 0138CR001518 ("Exhibit F").

**Plaintiff does not dispute this fact.**

23. Jeannite was subsequently convicted by a criminal jury of the charge of failure to produce a license and registration.

**This "fact" is misleading, as the plaintiff was acquitted of the criminal charge of disorderly conduct and found guilty of only the traffic offense of failure to produce a license.**

24. Shortly after the arrest and filing of criminal charges against Jeannite, Chief Brighi met with Jeannite and his criminal attorney, Marsha Kazarosian ("Kazarosian"), at Kazarosian's request. Excerpts from Deposition of Stephen Brighi ("Exhibit G"), p.43, l.12-17.

**Plaintiff does not dispute this fact.**

25. To prepare for the meeting, Brighi reviewed the police reports generated by Jeannite's arrest, and concluded that probable cause existed for the arrest and filing of criminal charges against him. Exhibit G, p.40, l.4-10, l.21-23.

**Plaintiff disputes this fact, for if there was probable cause to arrest him, then why would defendant Brighi offer to drop all criminal charges if the plaintiff gave up his civil rights claims based upon the arrest.**

26. The department's head of Internal Affairs, Sgt. John Arahovites, also attended the meeting, at Brighi's request. Exhibit G, p.44, l.10-11.

**Plaintiff does not dispute this fact but suggests that it is irrelevant.**

27. At the meeting, Kazarosian repeatedly expressed concern that Jeannite's arrest would negatively affect his status as a student at Norwich University, and possibly result in his expulsion, giving Brighi the "impression … that Miss Kazarosian and Mr. Jeannite were looking

for a way out of the charge." <u>Exhibit G</u>, p.44, l.15-19; p.45, l.9-11; <u>see also</u> <u>Excerpts from Deposition of John Arahovites</u> ("Exhibit H"), p.52, l.23-p.53, l.1.

    **Plaintiff does not dispute this fact.**

28. Based on compassion for Jeannite's situation and the relatively minor nature of the charges against him, Brighi offered to "make a call to the District Attorney's office," to try to get Jeannite enlisted in a "diversion" program. <u>Exhibit G</u>, p.45, l.20-p.46, l.7); <u>Exhibit H</u>, p.65, l.10-14; p.66, l.1-3.

    **Plaintiff does not dispute this fact.**

29. "Diversion" is a program run by the District Attorney's office which offers young people charged with minor violations a chance to perform community service in exchange for having the criminal charges removed from their record. <u>Exhibit H</u>, p.53, l.20-24; p.54, l.3-13.

    **Plaintiff does not dispute this fact.**

30. Brighi "certainly didn't hear anything … by Attorney Kazarosian or Mr. Jeannite that day that would lead me to believe there were any civil rights violations" by his officers. <u>Exhibit G</u>, p.52, l.7-13. However, Kazarosian's reputation as a high-profile civil rights lawyer, rather than a criminal attorney, suggested to Brighi the potential for a subsequent civil suit. <u>Exhibit G</u>, p.51, l.5-12; <u>see also</u> <u>Borne, et al. v. Haverhill Golf & Country Club</u>, Suffolk Superior Court, C.A. No. 96-6511-C (Jan. 24, 2000)).  This concerned him, since his review of the police reports established no wrongdoing, and, since, in his experience "not every civil rights lawsuit … deserves to be brought." <u>Exhibit G</u>, p.50, l.24-p.51, l.4; p.51, l.22-p.52, l.1.

    **If this is true, then why would defendant Brighi offer to trade criminal charges for a release of any civil rights claims.**

31. Thus, Brighi requested assurance from Kazarosian that she would not "bring some type of a lawsuit against the City "after I grant your wish and try to get this case dismissed." Exhibit G, p.46, l.14-19.

**Plaintiff does not dispute this fact.**

32. Kazarosian declined to give such assurance. Exhibit G, p.46, l.19-20.

**Plaintiff does not dispute this fact.**

33. Brighi and Arahovites also offered Jeannite the opportunity to file a written complaint, and even offered to bring Jeannite a complaint form. Exhibit H, p.61, l.1; p.68, l.19-21; p.69, l.6-10. Jeannite, however, declined to file a written complaint. Exhibit H, p.61, l.1-2; p.69, l.11-12.

**Plaintiff does not dispute this fact but suggests that it is irrelevant.**

34. Pursuant to the policies and procedures of the Haverhill Police Department, the filing of a written complaint of officer misconduct triggers an investigation which includes interviews with all witnesses to the subject incident; requests for written reports from the subject officer(s) and any other member of the police department connected to the subject matter of the complaint; review of the complaint and subsequent investigation by the Chief of Police; and, if necessary, creation of a panel to conduct further investigation. City of Haverhill Police Department General Order No. 3 ("Exhibit I"), §1(2)-(5).

**Plaintiff does not dispute this fact.**

35. Filing of a written complaint is not necessary to trigger an investigation; where a complainant wishes to make a verbal complaint only, the Officer in Charge at the time must submit a report to the Chief of Police "indicating the action taken on the complaint." Exhibit I, §1(b)(1)(b)(1). The department's policy further provides that, where warranted, a range of disciplinary measures may be imposed, including but not limited to letters of reprimand,

punishment duty, suspension, and discharge (with the Mayor's consent). <u>Police Manual for the City of Haverhill</u>, Section 1-J ("Exhibit J").

**Plaintiff does not dispute this fact.**

36. Following the meeting, Brighi directed Arahovites to order all three officers involved in the arrest to submit reports on the incident for his review. <u>Exhibit H</u>, p.64, l.2-3; <u>Memoranda to Officers Doherty, Dekeon and Fogarty from Sgt. Arahovites</u>, and <u>Responding Memoranda</u> ("Exhibit K"). Based on his review of these reports, Brighi saw "absolutely" nothing wrong with the arrest. <u>Exhibit G</u>, p.51, l.22-p.52, l.7.

**If defendant Brighi saw nothing wrong with the arrest, then why did he offer to drop the criminal charges if Mr. Jeannite gave up his civil rights claims?**

37. Brighi had no further involvement in Jeannite's prosecution, and neither he nor any Haverhill police officer had any communication with the prosecuting authorities about the disposition of the charges against Jeannite. <u>Exhibit G</u>, p.47, l.6-18; <u>Excerpts from Deposition of Murat Erkan</u> ("Exhibit L"), p.21, l.4-5, l.14-16; p.26, l.13-20; p.50, l.22-p.51, l.1; p.57, l.10-14.

**Plaintiff does not dispute this fact.**

38. All Haverhill police officers, including the defendants, have completed training in an academy operated by the Municipal Police Training Committee (formerly called the Massachusetts Criminal Justice Training Council), which includes instruction in constitutional issues such as arrest, search and seizure and motor vehicle stops. <u>Exhibit A</u>, p.16, l.11-23; <u>Exhibit B</u>, p.11, 12-20; p.12, l.7-p.13, l.1; <u>Exhibit C</u>, p.10, l.13-15; p.11, l.14-18; <u>Exhibit G</u>, p.10, l.18-20; <u>Answers to Plaintiff's First Set of Interrogatories to City of Haverhill</u>, No. 4 ("Exhibit M").

**Plaintiff does not dispute this fact.**

39. After completing the academy, officers receive an in-house orientation, which includes ride-alongs with senior officers. <u>Exhibit A</u>, p.17, l.7-16; <u>Exhibit C</u>, p.15, l.13-15.

 **Plaintiff does not dispute this fact.**

40. All officers also take between 32 and 40 hours of annual "In-Service" training, which includes instruction on developments in constitutional law. <u>Exhibit C</u>, p.12, l.2-8; <u>Exhibit G</u>, p.18, l.19-24; <u>Exhibit M</u>.

 **Plaintiff does not dispute this fact.**

41. Further, every officer is provided a copy of the Haverhill Police Department's Policies and Procedures manual, which contains information on constitutional law issues such as search and seizure, arrest, detainment, and the use of force. All officers must provide written acknowledgment of receipt of the Policies and Procedures Manual. <u>Exhibit A</u>, p.55, 1.15-19; <u>Exhibit B</u>, p.45, 1.19-p.46, 1.2; <u>Exhibit C</u>, p.34, 1.23-p.3.5, 1.6; <u>Exhibit M</u>.

 **Plaintiff does not dispute this fact.**

42. In addition, Haverhill police officers attend seminars and courses outside the Department, which are coordinated by the Department's Training Officer. Exhibit M. These seminars include instruction in areas such as investigation, public service, and quelling civil disturbances. <u>Exhibit A</u>, p.53, l.7-13; <u>Exhibit C</u>, p.13, l.2-4; <u>Exhibit G</u>, p.19, l.13-17. At the time of the incident underlying the Complaint, all of the defendant officers had also attended cultural diversity training. <u>Exhibit G</u>, p.21, l.5-8, l.18-23.

 **Plaintiff does not dispute this fact.**

43. Chief Brighi, who served as head of Internal Affairs prior to becoming Chief, testified that in his seven years with Internal Affairs, the department investigated five to 10 citizen complaints each year, with about half resulting in disciplinary action, including an average of one

suspension a year. Exhibit G, p.55, l.12-p.56, l.24. During his 15-month tenure as Chief, Brighi suspended one officer as the result of a citizen complaint. Exhibit G, p.52, l.22-p.53, l.1.

**Plaintiff does not dispute this fact.**

44. Prior to the incident underlying the Complaint, one citizen complaint was lodged against Officer Doherty. Exhibit A, p.45, l.13-19. This complaint, in which a white female alleged that Doherty had punched her while effecting her arrest, was investigated and deemed unfounded. Exhibit A, p.46, l.1-11; p.48, l.18-19.

**Plaintiff does not dispute this fact.**

45. Prior to the incident underlying the Complaint, Fogarty was the subject of only one citizen complaint, for making an inappropriate remark. This complaint was investigated and Fogarty received a verbal reprimand. Exhibit B, ¶. p.59, l.13-24.

**Plaintiff does not dispute this fact.**

46. Dekeon, who had been an officer for more than 12 years as of the date of Jeannite's arrest, had been reprimanded a handful of times prior to the arrest for minor infractions such as tardiness and driving out of his assigned sector. Exhibit C, p.78, l.16-p.79, l.5.

**Plaintiff does not dispute this fact.**

47. On January 16, 2002, Kazarosian presented a notice of claim, purportedly pursuant to <u>G.L. c.258, §4. Letter from Marsha V. Kazarosian to the Honorable John Guerin, et al.</u> ("Exhibit N"). The letter, which alleges constitutional and intentional torts by the defendant officers, Id., ¶¶9, 14, contains no reference to any alleged negligence by the City or its employees, and does not allege any failure by the City to adequately train and supervise its officers. Id., generally.

      **Plaintiff does not dispute this fact.**

|  |  |
|---|---|
|  | Plaintiff by counsel, |
| Date: <u>11/7/05</u> | <u>/s/ Andrew M. Fischer</u><br>Andrew M. Fischer<br>JASON & FISCHER<br>47 Winter Street, #4<br>Boston, MA 02108 |
| With the assistance of<br>Brandyn Keatring, law student | (617) 423-7904<br>BB0# 167040 |

jeannite\jeannite Contested Facts.wpd