EXHIBIT

B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
JOEL JEANNITE,                          *
      Plaintiff                         *
                                        *
VS.                                     *    CIVIL ACTION
                                        *    NO. 04-10541-RWZ
CITY OF HAVERHILL, STEPHEN              *
BRIGHI, in his capacity as Chief        *
of THE HAVERHILL POLICE                 *
DEPARTMENT, STEPHEN DOHERTY,            *
GEORGE DEKEON, JR., JOHN DOE and        *
JOHN ROE,                               *
      Defendants                        *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *      *
```

        **DEPOSITION OF JOEL JEANNITE**, called by the
Defendants, pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before Ruth E.

Hulke, Certified Shorthand Reporter No. 114893 and Notary

Public for the Commonwealth of Massachusetts, at Kopelman

and Paige, P.C., 31 St. James Avenue, Boston,

Massachusetts, on Wednesday, November 24, 2004,

commencing at 10:30 a.m.

## *Leavitt Reporting, Inc.*

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

*Hearings ◆ Conferences ◆ Legal Proceedings*

1    Q.    And which side of the street were you parked

2  on?

3    A.    Right side, sir.

4    Q.    Now, had you spoken with any person on that

5  street before you got arrested about why you were there?

6    A.    No, sir.

7    Q.    When the cruiser arrived, did it have its blue

8  lights on?

9    A.    Yes, sir.

10    Q.    You heard the siren?

11    A.    Yes, sir.

12    Q.    How many cruisers initially appeared?

13    A.    Three, sir.

14    Q.    And do you know how many officers were in each

15  of those cruisers?

16    A.    I don't remember, sir.

17    Q.    Do they all appear at the same time?

18    A.    Yes, sir.

19    Q.    And if you could paint me a verbal picture, so

20  to speak, where were those cars located with respect to

21  your car, those cruisers?

22    A.    My car was right side on the curb, nine inches.

23  Two cruisers was from the back, one cruiser came from the

1   front of the, exiting of Union Street.

2      Q.   At any point on that day before you were

3   arrested, did some civilian, non-police officer approach

4   your car?

5      A.   No, sir.

6      Q.   While in your car that day before you were

7   arrested, did you have a discussion with any person other

8   than a police officer?

9      A.   No, sir.

10      Q.   You'll forgive these questions, please, but was

11   it your intention that day in going to Union Street to

12   purchase drugs?

13      A.   No, sir.

14      Q.   Did you purchase any drugs that day?

15      A.   Sir, I'm an athlete.  I value my body.  I don't

16   pollute smoke nor alcoholic beverages in my system.  So I

17   don't feel a need to have any drug.

18      Q.   Did you meet with anyone on the street that day

19   who tried to sell you drugs?

20      A.   No, sir.

21      Q.   Your testimony today is that after speaking

22   with the Hispanic lady you returned to your car to make a

23   phone call.  Correct?

1      A.    That's correct, sir.

2      Q.    That you placed the call?

3      A.    Yes, sir.

4      Q.    And then broke it off when the police arrived.

5  Is that correct?

6      A.    When they spoke to me, I hung up the phone.  I

7  thought it was rude to be on the phone at the same time

8  while the cop was talking to me.  So I gave him the

9  respect and cut my conversation short.

10     Q.    Did you speak with any other civilian apart

11 from the Hispanic lady on Union Street in person before

12 you were arrested?

13     A.    No, sir.

14     Q.    Now, you mentioned that some police officer

15 spoke to you.  Is that correct?

16     A.    Yes, sir.

17     Q.    Do you know who that was?

18     A.    I don't remember his name, sir.

19     Q.    Can you describe that person physically?

20     A.    I don't remember his physical appearance

21 either, sir.

22     Q.    What did he say to you?

23     A.    He asked me for a license and identification,

1   sir.

2        Q.   Did you have a license on your person at that

3   time?

4        A.   No, sir.

5        Q.   Why was that?

6        A.   I came from the YMCA.  I was wearing shorts.

7   My shorts didn't have pockets, sir.

8        Q.   Where was your license at the time the police

9   encountered you?

10        A.   I believe it was at home, sir.

11        Q.   Did you have -- Strike that.  Did you have a

12   valid license on that date?

13        A.   No, sir.

14        Q.   Had it been suspended?

15        A.   No, sir.

16        Q.   My question is, although I know you didn't have

17   it on your person, were you a duly licensed Massachusetts

18   driver?

19        A.   Yes, sir.

20        Q.   What YMCA did you go to just before going to

21   see Melissa?

22        A.   Haverhill YMCA.

23        Q.   Were you a member there in July of 2001?

1       A.    Yes, sir.

2       Q.    What did you do for a workout that day?

3       A.    I played basketball, sir.

4       Q.    Did you take a shower before going to see this

5  young lady?

6       A.    Yes, sir.

7       Q.    When you were asked to produce a license or

8  some type of ID, did you at some point have some form of

9  identification on your person?

10      A.    Yes, sir.

11      Q.    What was that?

12      A.    I had my Norwich University photo ID, sir.

13      Q.    When you were asked to produce a license or

14  some type of identification, did the officer actually ask

15  you "Show me your license"?

16      A.    Yes, sir.

17      Q.    And did he also ask for your registration?

18      A.    Yes, sir.

19      Q.    Did you have a registration with you at that

20  point?

21      A.    Yes, sir.

22      Q.    Did you produce either of those items to the

23  officer?

1     A.   Both of them, sir.

2     Q.   You couldn't produce your license.  Correct?

3     A.   That's correct.

4     Q.   What did you give the officer?

5     A.   I gave him the Norwich University ID card and

6 proof of purchase of the vehicle, sir.

7     Q.   How long prior to July 30th had you bought that

8 car?

9     A.   I don't remember, sir.  It was approximately --

10 I don't remember.

11    Q.   Was the car registered properly and insured

12 properly on that day?

13    A.   Yes, sir.

14    Q.   When the officer first approached you and asked

15 you for some identification, how would you characterize

16 his tone?

17    A.   It was normal.  It was friendly.

18    Q.   And were you angry at that point about being

19 approached by this officer?

20    A.   No, sir.

21        MR. FISCHER:  Objection.

22    Q.   After you produced your registration and your

23 Norwich school ID, what next happened?

1       A.   My girlfriend was in the back of the ID, and

2    they were making unwanted comments about her and

3    laughing.

4       Q.   How many officers initially approached you to

5    ask you to produce an ID?

6       A.   Three.

7       Q.   Did only one of them speak to you initially?

8       A.   No.  All of them spoke.

9       Q.   Did they all ask you to produce an ID?

10      A.   Yes, sir.

11      Q.   Now, when you say your girlfriend was on the

12   back of the ID, what do you mean?

13      A.   They, they were making derogatory racial

14   comments about her.

15      Q.   All right.  I'll get to that.  My question is

16   this.  Is what you mean to say that her picture was stuck

17   on the back of your ID?

18      A.   Yes.  Yes.

19      Q.   Who was this girlfriend at that point in time?

20      A.   That was my girlfriend.

21      Q.   What's her name?

22      A.   Julie.

23      Q.   What's her last name?

LEAVITT REPORTING, INC.

1     A.   Faucher.

2     Q.   How do you spell that?

3     A.   F A U C H E R.

4     Q.   Where does Julie live?

5     A.   She lives in Haverhill.

6     Q.   Do you still see her?

7     A.   No.  It's been a while.

8     Q.   Were you dating her in July of 2001?

9     A.   Yes, sir.

10    Q.   What is Julie's race?

11    A.   She's Caucasian.

12    Q.   After the officers looked at your ID, did they

13  make some comments that you found offensive?

14    A.   Yes, sir.

15    Q.   How many officers made comments that you felt

16  were offensive?

17    A.   Two of them.

18    Q.   Do you know their names?

19    A.   No, sir.

20    Q.   Can you describe them physically?

21    A.   No, sir.

22    Q.   What was their race?

23    A.   All white, sir.

1      Q.   Do you know their age, approximately?

2      A.   No, sir.

3      Q.   Do you know their height?

4      A.   No, sir.

5      Q.   Weight?

6      A.   Repeat that, sir.

7      Q.   Their weight?

8      A.   No, sir.

9      Q.   Were they in uniform?

10     A.   Yes, sir.

11     Q.   What comments did these two men make?

12     A.   I would rather not think back about that, sir.

13     Q.   I appreciate it, but I need to press you on

14 that point.  I would like an answer to the best of your

15 memory as to what they said.

16     A.   I'm sorry, sir.  I'd rather not go back.  It

17 was too touching for me.

18     Q.   Are you refusing to answer that question?

19          MR. FISCHER:  Let me speak to him for a second.

20          MR. TEHAN:  All right.

21          THE WITNESS:  Actually, I'll answer the

22 question if you want me to.

23          MR. FISCHER:  I would.

1          I don't mind saying this in front of you.

2          Mr. Tehan on behalf of the defendants is

3    entitled to know what you're going to say at trial.  So

4    if you want to be able to say it at trial, you need to be

5    able to say it to Mr. Tehan now.

6          A.    All right.

7          Q.    What were the comments that the two officers

8    made that you found offensive?

9          A.    One of them whispered, "What's a good looking

10   white chick dating a black kid like that?"

11         Q.    Was that a comment that he made to another

12   officer as opposed to you?

13         A.    Yeah.

14         Q.    How close to you were they when --

15         A.    Right next to my driver.

16         Q.    Did the other officer make any statement?

17         A.    No, sir.

18         Q.    Did you make any statement when they said that?

19         A.    No, sir.

20         Q.    Were you angry when you heard that?

21         A.    No, sir.

22         Q.    What next happened?

23         A.    They ran my registration and my name, sir.

1        Q.    How do you know they did that?

2        A.    He stood right next to my window and I heard

3    him radio it in.

4        Q.    Did you hear any response on the radio to that

5    question by the officer?

6        A.    Yes, sir.

7        Q.    What did you hear over the radio?

8        A.    I heard the XJZ Jaguar sedan, I believe, was

9    registered to a person named Joel Jeannite who lives on

10   104 Main Street.

11       Q.    Was there any question over the radio about

12   your license status?

13       A.    No, sir.

14       Q.    Did any officer in your presence before you

15   were arrested do anything that you saw to confirm whether

16   or not you had a valid license?

17       A.    Yes, sir.

18       Q.    What was that?

19       A.    They were through that radio process I just

20   explained, I was told my license was valid and matches my

21   address and my car.

22       Q.    You actually heard that yourself over the

23   officer's radio?

1      A.   Yes, sir.

2      Q.   Was it a portable radio on his body?

3      A.   Yes, sir.

4      Q.   In the sequence of events, Mr. Jeannite, what

5   next happened?

6      A.   From there on all I heard was "Get the F out of

7   the car."

8      Q.   At the time that you were asked to produce some

9   identification, did anyone tell you why?

10     A.   No, sir.

11     Q.   At any time before you were arrested, did any

12  officer tell you they had received a call to that street?

13     A.   No, sir.

14     Q.   Did any officer tell you that they had received

15  a call about suspicious activity on the street?

16     A.   No, sir.

17     Q.   Did any officer tell you anything in terms of

18  why they were looking for your ID?

19     A.   No, sir.

20     Q.   Respectfully, you seem to hesitate.  Are you

21  clear on your answer on that point?

22     A.   Yes, sir.

23     Q.   In total, how many officers did you encounter

1    on Union Street that day?

2        A.    Four, sir.

3        Q.    Do you know any of their names?

4        A.    No, sir.

5        Q.    Did you observe the ranks of any of these

6    officers by any markings on their uniforms?

7        A.    No.

8        Q.    Do you have any memory of anyone speaking with

9    you who had sergeant stripes on his arms?

10       A.    No, sir.

11       Q.    Do you have any memory of any officer

12   mentioning to you that he had gone to Norwich University?

13       A.    Yes, sir.

14       Q.    What response did you make to that bit of

15   information, if anything?

16       A.    Said, "Congratulations.  I'm also a future

17   alumni, too."

18       Q.    Prior to being ordered out of your car, did you

19   make any statement to the police that you believed their

20   interaction with you was a form of racial harassment?

21       A.    Prior, no, sir.

22       Q.    At any point before the time you got arrested

23   did you make a comment to the police that they were

1  hassling you and harassing you because you were black, or

2  words to that effect?

3       A.   I don't remember, sir.

4       Q.   Do you have any memory of bringing the issue of

5  race into the discussion with the police officers on

6  Union Street?

7       A.   I don't remember.

8       Q.   One way or the other?

9       A.   One way or the other.

10      Q.   At any point before you were arrested did you

11 ask the officers why they were arresting you?

12      A.   No, sir.

13      Q.   Before you were arrested, at any point did you

14 tell the officers they were only stopping you because

15 you're a black man?

16      A.   No, sir.

17      Q.   Did you have a Norwich University sticker on

18 your car?

19      A.   Yes, sir.

20      Q.   Where was it located?

21      A.   On the back window, sir.

22      Q.   Did any officer tell you they received a call

23 that there was someone in the neighborhood asking

1    questions and that's why they had encountered you?

2        A.    No, sir.

3        Q.    Did you ask the police officers if anyone had

4    called them to the scene?

5        A.    No, sir.

6        Q.    At any point prior to your arrest did you tell

7    any officer, "You can shut up and go fuck yourself"?

8        A.    No, sir.

9        Q.    Did you say anything to that effect?

10       A.    No, sir.

11       Q.    Now, when you were ordered out of your car, did

12   you do so?

13       A.    No, sir.

14       Q.    Did you stay in your car?

15       A.    I stepped out of my vehicle, sir.

16       Q.    Okay.  Let me get the question clear.  At some

17   point an officer ordered you to get out of your car?

18       A.    Yes, sir.

19       Q.    Did you comply with that order?

20       A.    Yes, sir.

21       Q.    What next happened?

22       A.    I was placed in handcuffs, sir.

23       Q.    Where were you standing when you were placed in

LEAVITT REPORTING, INC.

1   handcuffs?

2        A.   Right in front of my, as soon as I stepped out

3   of the vehicle.

4        Q.   Where were you standing?

5        A.   I believe right between the threshold of my

6   driver door and passenger.

7        Q.   Were you handcuffed facing the car?

8        A.   Yes, sir.

9        Q.   Were you asked to put your hands behind your

10  back?

11       A.   No, sir.

12       Q.   Were you told to put your hands behind your

13  back?

14       A.   I just automatically went there.

15       Q.   Did some officer grab your arm?

16       A.   No, sir.

17       Q.   You put your hands behind your back

18  voluntarily.  Correct?

19       A.   Yes.

20       Q.   You were then cuffed?

21       A.   Yes.

22       Q.   Do you know which officer cuffed you?

23       A.   No, sir.

LEAVITT REPORTING, INC.

1    Q.   At the time you were handcuffed, did you have

2  any further discussion with the officers?

3    A.   No, sir.

4    Q.   At that point did you know why you were being

5  arrested?

6    A.   No, sir.

7    Q.   Did you notice at the time you stepped out of

8  the car whether there were any on-lookers to your

9  encounter with the police?

10    A.   No, sir.

11    Q.   One way or the other?

12    A.   There was no one looking.

13    Q.   Was there anyone standing on the sidewalk?

14    A.   No.

15    Q.   Was there anyone on the street?

16    A.   No.

17    Q.   Was there anyone hanging out their windows

18  looking?

19    A.   I don't remember that information, sir.

20    Q.   After you were handcuffed, what next happened?

21    A.   I was placed in the back of the cruiser, sir.

22    Q.   At some point did the officers tell you they

23  wanted to do some type of search of your car?

1          A.    No, sir.

2          Q.    Was there an issue about your trunk?

3          A.    No, sir.

4          Q.    Did you have a key to the truck?

5          A.    Actually, there was an issue.  There was a hole

6    in my truck.

7          Q.    Where the lock should have been?

8          A.    Yes, sir.

9          Q.    How did that happen, do you know?

10          A.    It was like I explained earlier.  It was a

11    cheap car, two thousand bucks, it was in a junkyard.  So

12    the holes, that why the car was so cheap.  It was badly

13    beaten.

14          Q.    Did it ever have a working trunk lock prior to

15    July 30th, 2001?

16          A.    No, sir.

17          Q.    How did you open the trunk?

18          A.    It was, like, there was a click button.  It was

19    a design button.  It was kind of like off and on like.

20    You just push and the trunk pops automatically.

21          Q.    That was from inside the car?

22          A.    No.  That was from outside the car.

23          Q.    Where was that located?

1    A.   Underneath, by the license plate.

2    Q.   Did any officer open the trunk while you were

3  still on Union Street?

4    A.   Yes, sir.

5    Q.   What was in the trunk at that point?

6    A.   I don't remember, sir.

7    Q.   Was there any comment made by any officer in

8  terms of what they had seen in the trunk?

9    A.   No, sir.

10   Q.   Is it your testimony today, Mr. Jeannite, that

11  prior to becoming handcuffed no one told you what you

12  were getting arrested for?

13   A.   No, sir.

14   Q.   Is that your testimony?

15   A.   Yes, sir.

16   Q.   Do you know the name of the officer whose

17  cruiser you were placed in?

18   A.   No, sir.

19   Q.   Were you taken to the police station?

20   A.   Yes, sir.

21   Q.   And how many officers were in that car?

22   A.   Two, sir.

23   Q.   Do you know their names?

1    A.    No, sir.

2    Q.    Were either of those officers the one who made

3  the comment about your girlfriend being white, or

4  something to that effect?

5    A.    I don't remember, sir.

6    Q.    Did you have any discussions with the officers

7  en route to the station?

8    A.    No, sir.

9    Q.    Prior to being placed in the cruiser, did you

10  raise your voice in discussion with the officers?

11    A.    No, sir.

12    Q.    Were you yelling at them?

13    A.    No, sir.

14    Q.    Were you swearing at them?

15    A.    No, sir.

16    Q.    Were they yelling at you?

17    A.    No, sir.

18    Q.    Is it your memory then in your encounter with

19  the police while still on Union Street both you and the

20  police spoke in a normal conversational tone?

21    A.    While on Union Street?

22    Q.    Yes.

23    A.    My tone was very calm.

```
1        Q.   That was my question a moment ago.  Did the
2   police yell at you?
3        A.   Yes, sir.
4        Q.   How many police officers raised his voice to
5   you?
6        A.   Three, I believe.  One.  One of them, sir.
7        Q.   And was his voice raised when he ordered you to
8   get out of the car?
9        A.   Yes.  With vulgarity.
10        Q.   "Fuck"?
11        A.   Yes.  "Get the F."
12        Q.   "Get the fuck out of the car"?
13        A.   Yes, sir.
14        Q.   Was there any other time any other police
15   officer raised his voice to you?
16        A.   No, sir.
17        Q.   Do you know Officer Dekeon?
18        A.   That name sounds familiar, sir, yes.
19        Q.   Do you remember him by name as being involved
20   with your arrest on July 30th, 2001?
21        A.   Yes, sir.
22        Q.   Do you know Officer Doherty, Stephen Doherty?
23        A.   Yes, sir.
```

1  COMMONWEALTH OF MASSACHUSETTS
   PLYMOUTH, SS.
2
       I, Ruth E. Hulke, a Notary Public in and for the
3  Commonwealth of Massachusetts, do hereby certify there
   came before me on the 24th of November, 2004, the person
4  hereinbefore named and that he was duly sworn to testify
   to his knowledge concerning the matters in controversy in
5  this cause; that he was thereupon examined under oath,
   and that the foregoing transcript is a true record of the
6  testimony given by the witness.

7      I further certify that I am neither attorney nor
   counsel for, nor related to or employed by any of the
8  parties to the action in which this deposition was taken;
   and, further, that I am not a relative or employee of any
9  attorney or counsel employed in this case, nor am I
   financially interested in this action.
10
       IN WITNESS THEREOF, I have hereunto set my hand and
11 affixed my seal this _____ day of _December_ ,
   2004.
12
                    _____
13                  RUTH E. HULKE, NOTARY PUBLIC
                    Certified Shorthand Reporter No. 114893
14                  My Commission Expires: November 1, 2007

15

16

   PLEASE NOTE:
17     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
   NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
18 UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
   CERTIFYING REPORTER.
19

20

21

22

23

LEAVITT REPORTING, INC.